JOHN H. ANDERSON et al., Appellees, v. KATHERINE E. WEIRSMITH et al., Appellants.

No. 40126.

FEBRUARY 11, 1930.

*Lloyd L. Duke* and *McNett, McNett & Kuhns,* for appellants.

*Chester W. Whitmore,* for appellees.

GRIMM, J.—On September 30, 1927, the plaintiffs, John H. Anderson, father, and Carl H. Anderson, son, filed in the district court of Wapello County a petition, praying for a decree requiring the defendants to convey certain real estate in Ottumwa, Iowa, to the plaintiffs, pursuant to the terms of a certain contract in writing, alleged to have been entered into August 19, 1927, and asking for an assignment of or an accounting concerning the rents on said property from August 1, 1927. The contract is dated August 19, 1927, and is signed by the defendants, Katherine E. Weirsmith and Fred A. Weirsmith, per Katherine E. Weirsmith, agent, as grantors, and by each of the plaintiffs, as purchasers. It in specific terms provides that the sellers agree to sell and convey, and the purchasers agree to purchase and pay for, the property described. The consideration is $18,500, of which $500 is to be paid upon the execution of the contract, and the balance upon the delivery of a special warranty deed and abstract. The time of the several payments is made of the essence of the contract. The contract provides that the deed should be delivered and the transaction closed before September 5, 1927.

The property in question is a business building, known as 115 East Main Street, in the city of Ottumwa. The real estate is approximately 14 feet 10 inches wide by 132 feet deep. There is located on this ground an old two-story building, the ground floor of which is 100 feet deep, and the second floor 50 feet deep. At the time involved in this case, there was a 10-year lease on the property, running to M. D. Rich, as assignee, expiring April 1, 1929, at a rental of $95 per month. The original owner, the father of the defendants, who died April 22, 1890, paid $830 for the lot and building. The title to this property passed by inheritance to the defendants, Katherine E. Weirsmith and Fred A. Weirsmith, both of Ottumwa,

Iowa, and Charles G. Weirsmith, formerly of Ottumwa, and at the time of the transactions involved in this case living in California. At the time of the contract to convey, Katherine was the holder of a trust deed from Charles, given to her at a time when Charles was having some litigation and financial troubles. Charles, however, was not owing Katherine any money in connection with the transaction, and very shortly after the contract to convey was executed, Charles executed a quitclaim deed to the property in controversy to Katherine. The said contract to convey was prepared by a realtor of Ottumwa named Graham, and he secured the signatures of the sellers appearing on the contract.

Very briefly stated, by a lengthy answer and amendment thereto the defendants resisted the claims of the plaintiffs by alleging, in substance, that the property, on the day the contract was executed, was owned one third each by Katherine, Fred, and Charles Weirsmith. While admitting the signature of Katherine and the signature of Fred by Katherine, the defendants denied that she signed the document for herself or on behalf of Fred as her free and voluntary act, but alleged that the paper was signed by reason of misrepresentations, and that the document would not have been signed by the sellers except for said misrepresentations; that, when the defendants discovered the alleged misrepresentations, fraud, and deceit claimed to have been practiced upon them by Graham, the plaintiffs were promptly notified that the said contract was invalid, and they tendered to the plaintiffs the $500 down payment, which tender was refused both by the plaintiffs and by Graham.

It is alleged that Fred never at any time consented to the sale of his interest in the premises, and that he never had authorized or empowered Katherine or any other person, as his agent or representative, to sell the property; and furthermore, they deny that Fred ever ratified or confirmed the sale. It is affirmatively alleged, on behalf of the defendants and each of them, that the contract to sell was wrongfully procured; that the defendant Katherine was a maiden lady 62 years of age, engaged for many years as a teacher in the public schools of Ottumwa; that the defendant Fred is a mechanic, by trade; that the real estate is located in the most valuable business

block in the city of Ottumwa; and that it is valuable, and has been constantly increasing in value; that the lease on the premises was made at a time when the property had lain idle for approximately 18 months, and when property in that particular block was not so constantly in demand as at the time of the present action. Generally speaking, it is the claim of the defendants that Graham's authority was only to deal with the then tenant for a new lease, or with others for a different and better lease, and that the property was not for sale.

It is also claimed that the consideration named in the contract was wholly inadequate, and much below what could at the time have been obtained from other prospective purchasers; that Katherine was induced to sign upon the alleged representations by Graham to her; that Fred consented to the sale on the terms named in the proposed contract. It is further alleged that Graham was in fact the agent and representative of the plaintiffs, under authority and direction from the plaintiffs to procure a contract for the purchase of the premises. It is claimed that Katherine signed the document under mistake or misunderstanding as to the value of the premises, said mistake growing out of her inexperience in such matters and her unfamiliarity with the value of the property in question and other property of a similar character in the immediate vicinity. It is also alleged that Katherine was unable to perform, because of her inability to secure the consent of Fred or Charles to the transaction; that, inasmuch as the contract provided for the conveyance of the entire property, there was lacking mutuality in the contract; and that, by reason of the tender of the $500 and interest, the plaintiffs were fully reimbursed and made whole.

In the reply it is claimed that Fred failed to promptly notify plaintiffs as to his election not to ratify the contract, whereby it should be held that he ratified and affirmed the signing of his name by his sister, and ratified and affirmed the receipt by her, on his account, of such portion of the purchase price as belonged to him. During the progress of the trial, the plaintiffs admitted of record their willingness to accept a conveyance of the two-thirds interest held by Katherine in her own right and by assignment and by quitclaim deed from her brother Charles, the contract price to be abated relatively. The

lower court found for the defendant Fred, and for the plaintiffs, as against Katherine and Charles. The court finds that plaintiffs are entitled to two thirds of the rent of $95 per month accruing from said property on and after October 1, 1927, with 6 per cent interest per annum from the date of each and every payment, as against the two-thirds interest held by the said Katherine, to November 16, 1928, the date of the decision.

The court finds the amount due to be $10,915.49, which amount has been deposited with the clerk of the court, payable to Katherine when a special warranty deed has been filed, conveying to the plaintiffs an undivided two-thirds right, title, and interest in and to the property, free from all liens and incumbrances, together with an abstract showing the title; and that the plaintiffs are entitled to an undivided two thirds of the monthly rental from the property on and after December 1, 1928. The cause as against Fred Weirsmith was dismissed, with prejudice, and with costs in his behalf.

The decree was dated December 15, 1928; and on the 29th day of December, 1928, an appeal was perfected, and a supersedeas bond filed. The appellants set up 13 separate grounds for reversal, the consideration and determination of a few of which will dispose of all the others.

I. The principal storm area of the trial involved the alleged claim that the contract in question was secured by fraud and misrepresentation on the part of J. H. Anderson, acting through Graham, who, the appellants claim, was the agent of Anderson.

We will first consider the question of agency. The plaintiff Carl H. Anderson, who is the son of J. H. Anderson, is only incidentally involved in the case, and unless hereinafter specifically mentioned, we will refer to J. H. Anderson as the plaintiff, he being the principal, and practically the only participant on behalf of the plaintiffs in this transaction. At the time the contract was entered into, the plaintiff was engaged in the clothing business in Ottumwa, under the name of "The Hub Clothier," in the property immediately adjoining the property in question. He owned the building he occupied with the clothing business, and other property in Ottumwa. He was president of the Ottumwa National Bank. The Weirsmith property was then occupied by what is known as "The Fair,"

under a lease running by assignment to one Rich, at what is conceded to have been a very low rental. This lease had been in force approximately eight years at the time this controversy arose.

It appears that Katherine acted as administratrix of the estate of her mother, and, without substantial contradiction, that she had handled, aside from the homestead and the property in question, five other real estate transactions, involving over $16,000 in the aggregate. It is apparent from the whole record that the brothers deferred to her skill and experience as to all matters pertaining to their property interests in Ottumwa. Katherine and Fred, each unmarried, lived together; but apparently Fred paid little, if any, attention to his real estate interests, leaving the same in Katherine's hands. Katherine was a superior woman, by native ability, training, and experience, with a long record of achievement, of which any woman might well be proud.

The building was quite old and narrow, as compared with the ordinary retail business room. The ground floor covered only a portion of the length of the lot, and the second floor still less. There was no front outside stairway to the upper floor. The building was in need of repairs, and it would require several thousand dollars to modernize the building so as to make it usable in a modern, practical, aggressive way as a retail store room.

Apparently, Graham's first connection with this entire transaction was a letter written by him December 14, 1926, to Fred at Ottumwa. The letter referred to both the sale and the rental of the property in controversy, Graham offering his assistance in connection with either sale or rental. Fred made no response, but Katherine brought the lease to the property to Graham's office. It appears that this was sometime in March, 1927. Katherine was at that time making inquiry as to the assignability of the then existing lease to Rich. Rich came to see Katherine, but she referred him to Graham. On March 22d, Graham wrote a letter addressed to both Fred and Katherine, further tendering his services in connection with either the leasing or the selling of the property in controversy. Other correspondence followed, which has no very material bearing on the issues. As a net result of the correspondence with both

Katherine and Fred, and the visits of Katherine to Graham's office, Graham claims, she finally gave him a price of $17,000 on the property. Graham priced the property to Anderson at $17,000, and Anderson, in turn, offered $15,500. It appears that Anderson was not then interested in the property at $17,000.

About the first week in June, 1927, Katherine left for her summer vacation, returning Saturday night, August 13th. Fred, in the meantime, had remained in Ottumwa; but he left for his vacation early on the morning of August 14th, without more than a few seconds of conversation with his sister. Apparently there had been no correspondence between Katherine and Fred during Katherine's absence on her vacation, or during Fred's absence on his vacation.

In the meantime, Charles Redman, of Ottumwa, with a letterhead marked "Real Estate Investments, Brokers-Reorganizing-Financing," wrote a letter, dated August 6, 1927, to Katherine, asking her to let him know as soon as she returned to the city, as he wished to call on her with an interesting proposition for the sale of her property. Parenthetically, it may be noted that, on December 3, 1926, the same party had written her, offering to buy the property in question.

When Katherine left for California, she referred the matter of necessary repairs on the building to Graham, and in various other ways indicated clearly that she regarded Graham as her agent and representative; but since this difficulty arose, she attempts to limit his authority solely to the matter of leasing the premises, and to deny any agency for sale purposes. There is in the record, from disinterested parties, evidence which shows that Katherine referred in an unrestricted sense to Graham as her agent.

Redman's letter to Katherine, which awaited her return from California, was not opened by her for a few days; but when she did so, she took the letter to Graham, and left it with him. Graham claims that she then told him:

"We have decided to sell this property [the property in question], and we want $18,000 net to us,—for your commission you must get over the $18,000."

She notified Graham that Fred had gone on his vacation, and said to him:

"But here is a letter that old Jew brought me, and you can just keep it. I don't want anything to do with him [meaning Redman]."

In the meantime, Graham was busily engaged, developing prospective purchasers for the property. Some clothing merchants who had previously been in business in Ottumwa expressed a desire to get back into business, and disclosed considerable interest in securing a location in the premises in controversy, next door to the prosperous plaintiff, engaged in the same business. There is some showing in the record to the effect that one of the former employees of the plaintiff was considering an association with these other merchants; and when this whole proposition reached the plaintiff, he conceived the idea that a competitor, under such circumstances, located next door to him might become quite detrimental to his business. Things began to move rapidly. Apparently Redman scented the situation, and also became an eager competitor for the purchase of the premises.

It appears from the record that, whether justified or not, Redman had acquired a somewhat unfortunate reputation. Apparently he had been the unfortunate victim of one or more fires, and he had been more or less involved financially and in litigation.

An hour or two before the signing of the contract in question, Redman appeared at Katherine's house, and said he was willing to pay her $20,000 for the property. She sent Redman to Graham. In her direct testimony she said, in substance, that she would have dealt with Redman if Graham had not spoken of him (Redman) as a fire bug. She further states that she sent Redman to Graham for rental purposes only, notwithstanding the fact that Redman was pressing her for the purchase of the property. In answer to a question by Katherine's counsel, "Why didn't you take up this $20,000 offer with Mr. Redman?" she answered, "Well, why—I thought that if there was—that he should see—I did not want to have anything to do with Mr. Redman, to tell the truth, if he had offered me $30,000." At another time she said she admitted that she told

Redman, who had talked sale to her, to see Mr. Graham. "I told him to see Mr. Graham. I didn't want any dealings with him, if he was a dollar man and a dollar forever afterwards,— it was up to Graham to sell him." She was asked this question:

"In declining the offer of Charles Redman of $20,000 for the property, at a loss of $1,500 under Anderson's offer, as sub-mitted to me by Mr. Graham, one of the reasons for your doing it was, irrespective of what anyone else may have said to you on the subject, you were not quite satisfied in your own judg-ment that Redman was the type of man you wanted to deal with on a deal of that kind,—isn't that true? A. Yes, sir. That is why I sent him [Redman] to Graham. Redman offered me $20,000 as a sale price of the property, and I referred him to Mr. Graham."

It is quite apparent from the record that, while Graham said various things to Katherine concerning Redman's stand-ing in the community as a business man, she, nevertheless, had an independent notion of her own, and did not care to deal with Redman. Redman promptly went to Graham, and offered him a substantial bonus or fee, on the side, if he, Graham, would secure the deal for him (Redman). Parenthetically we may say that there is a significant showing in the record that, when Redman learned that the sale had been made to Anderson, he became quite enraged at Graham, and expressed a hope that the deal would fall through, or the intention to block the deal if he could.

Shortly after Redman's visit to Katherine, Graham pre-sented to Katherine, at her home, the contract in question, which she signed, both for herself and for her brother Fred. On this subject she said, among other things:

"I signed this contract, Exhibit P 13, and at the time knew that it called for sale of this property at 115 East Main Street for $18,500."

Late in the afternoon of that day, Graham had secured a proposition from Anderson of $18,500; and about 7 o'clock in the evening, as above stated, Katherine signed a contract in duplicate, agreeing to sell the property for that amount. It was afterwards discovered that the description was not

correct, and very shortly thereafter, a second and corrected contract was signed. At this time, Katherine directed Graham to order the abstract from Mr. McElroy, an attorney and abstracter in Ottumwa. Both the plaintiffs and Graham unequivocally testified that Graham had no dealings whatever with Anderson in connection with the sale of this property, except Graham's conduct in inducing Anderson to make the offer for the property and in securing the signatures of the plaintiffs to the contract, and the $500 down payment. There is no direct evidence to the contrary, and there is nothing in the entire record from which any reasonable inference could be drawn that Graham was acting for Anderson; but the record quite clearly shows that Graham was authorized to act for Katherine, not only in the matter of rentals and care of the property, but likewise in the matter of securing the sale. Up to the time of Fred's return to Ottumwa, on or about the 30th day of August, Katherine evidenced no dissatisfaction whatever with the sale or its terms or Graham's conduct in the premises. She had just previously named to Graham a price of $17,000. She had knowingly refused to have anything to do with Redman and his offer of $20,000, and she knew, when she signed the contract, what she was doing, and that the contract called for the sale of the property at $18,500.

In this connection, the showing taken from the abstract is significant. Graham testified as follows:

"Close to the latter part of August, 1927, I had a talk with Miss Weirsmith at her house. She called me up by telephone. Q. What did she say when you went there? A. She said that Fred had just returned from his vacation, and that 'those old Jews had got a hold of Fred, and he isn't going to be a party to the contract;' and she was crying."

We have not attempted to set out all the evidence on the subject of Graham's agency with Katherine or Anderson. Suffice it to say, we are abundantly satisfied that Graham was Katherine's agent, and in no sense the agent of the plaintiffs. The record fails to disclose any fraud or misrepresentation, so far as the plaintiffs are concerned.

II. We are unable from the record to find that any fraud was committed upon Katherine Weirsmith by anyone. She

claims that she would not have signed the contract, had Graham not told her that Fred had consented to the sale. This alleged statement on the part of Graham is unequivocally denied; and furthermore, Katherine's version of the controversy seems more or less improbable, by reason of the fact that Fred had left on his vacation on the 14th day of August, and this offer of Anderson's of $18,500 had not even been considered, much less consummated, prior to August 19th. Katherine knew that Fred was away, and that Graham had no way of communicating with him on the subject. Furthermore, it quite clearly appears from the record that Fred was deferring, and always had been deferring, to Katherine in all matters pertaining to this and other property. He had shown a consistent course of conduct in deferring to her in all matters pertaining to all their property affairs. He had expressed himself to the effect that he knew little or nothing about the property; that Katherine knew more about it than he did; and that she was looking after it. This is confirmed by Katherine's course of conduct, as shown throughout the record. The mere fact that Katherine assumed to sign Fred's name to the contract evidenced her confidence in her position as Fred's representative, and that she had reasons sufficient to herself to believe that Fred would be satisfied with what she might do in the matter of selling the property. There is a fair inference from the entire record that Fred's dissatisfaction with the contract did not arise because of the contract or its terms, but rather, because of the activities of the parties who were ininterested in blocking the transaction. Redman had offered Graham a secret "rake-off" of $2,000 on the side if he, Graham, would secure the sale of the property to him; and his angry threats when he discovered that Anderson had secured the contract, when taken into consideration with other portions of the record, are, to say the least, quite significant. As hereinbefore stated, Katherine admitted that she knew just what she was doing when she signed the contract, and from the whole record we are satisfied that she did.

III. The appellants claim that specific performance should be denied because of the alleged suppression of bidding caused by Graham in connection with Redman's offer. The testimony

hereinbefore quoted clearly shows that Katherine had herself definitely refused Redman's offer of $20,000, and she even testified that she would not deal with him if he had offered $30,000. She had her own notions about Redman, and, as she states, her own previous views were confirmed by what Graham told her. Redman had first made her a proposition of a long-time lease, and his proposition to Graham involved Graham's assisting him (Redman) in financing the deal, as well as securing the contract for Redman. It is entirely possible, if not quite probable, that the defendants are better off with the cash proposition of $18,500 than had they dealt with Redman for a higher figure. Redman himself was very vague and indefinite in reference to his ability to pay for the property, his chief reliance apparently being on his ability to secure a loan from some eastern insurance company. In this connection it may be said, to the credit of Graham, that he did not accept Redman's offer of a special commission on the side, secretly made and carefully guarded, preferring rather to sell the property for his principal for cash, to a party abundantly able to carry out the terms of his contract. There is no satisfactory showing that Graham concealed any offers from his principals.

IV. It is claimed that specific performance should be denied because of inadequacy of consideration. We find in the record no basis for this claim. As is nearly always the case, there was an array of witnesses on either side, testifying to their estimates of the value of the property. On this subject the entire record has been carefully studied, and the conclusion is unhesitatingly reached that there is no element of inadequate consideration in the case, certainly not to an extent warranting a refusal of specific performance on that ground. It would serve no good purpose to quote from the testimony, or even give an analysis of it. Katherine had given Graham, shortly before the day of the contract, the price of $17,000 on the property. Anderson, prior to the time a firm threatened to establish a competing business next door to his establishment, had refused to pay $17,000, and said he was not interested. Furthermore, the width of the property, the length of the building, the age of the building, its state of repair, the amount necessary to expend to put it in first-class condition to use as a retail store, and many other circumstances which might be

mentioned, when taken into account with the lease then existing and continuing for a further period of two years, all are convincing that there is no such inadequacy of consideration as to warrant a refusal of specific performance.

V. Complaint is made of the testimony in the record from the attorneys Walter McElroy and Walter McNett. This testimony had to do, in the main, with a quitclaim deed which had been executed by Charles G. Weirsmith in California on August 30, 1927, quitclaiming to Katherine E. Weirsmith and to her heirs and assigns all his right, title, and interest in and to the property in question. Katherine already had a trust deed from Charles to the same property, and this quitclaim was procured for the sole purpose of mending the title of record. While some of the questions may have been improper, and others questionable, yet, on the whole, there is sufficient competent evidence in the record to warrant the trial court in finding Katherine the owner of a two-thirds interest in the property,—which, in the final analysis, was the ultimate question under consideration. The trial court is presumed to have considered only the competent evidence.

VI. It is claimed that specific performance should be denied because it would work a hardship not only on Katherine Weirsmith, but upon each of her brothers, and particularly upon Fred, who, if the lower court's decree for specific performance is sustained, will be left holding a one-third interest in the property. We are unimpressed with this claim. It is apparent that, with some marked genius of salesmanship, Graham played different prospects against Anderson's fears of a competitor, and thereby secured an adequate price for a narrow piece of real estate, supporting a building about 25 years old, antiquated, and much in need of expensive repairs, if modernized in accordance with present-day requirements. So far as Fred is concerned, if the appellants' claim of inadequacy of consideration is only in part true, and if a partition suit is brought, undoubtedly someone may be induced to purchase it, or at least to force Anderson to pay Fred at least what his interest in the property is really worth.

Much more might be said upon this subject, but suffice it to say, we do not find any evidence of such harsh consequences

to any of the Weirsmiths as to warrant us in refusing specific performance on that account.

VII. It is also claimed that specific performance should be denied because of lack of mutuality. The contract in question is clear and specific, and contains definite mutuality of obligations. On the question of mutuality of remedy, it will be noted that Katherine, by signing Fred's name to the contract, definitely represented to the plaintiff that she had authority so to do, and that she was in position to convey title in accordance with the terms of the contracts. So far as the record in this case shows, the plaintiffs knew nothing to the contrary. There is much in the record of a definite, substantial nature, tending to show that she had authority to contract for Fred; but, if it be assumed that she did not, can it be said that specific performance will not be decreed because she is not in a position to convey the entire title to the property? The courts are not entirely in harmony on this subject. The most satisfactory rule is that, although the purchaser cannot have a partial interest forced upon him, yet, if he entered into the contract in ignorance of the vendor's incapacity to give him the whole, he is generally entitled to have the contract specifically performed, as far as the vendor is able, and to have an abatement out of the purchase money for any deficiency in title, quantity, or quality of the estate. This is not making a new contract for the parties, since the vendor is not compelled to convey anything which he did not agree to convey, and the vendee pays for what he gets, according to the rate established by the agreement.

This court said, in *Townsend v. Blanchard*, 117 Iowa 36, in speaking of the failure of the vendor to secure his wife's signature to a deed to a piece of land, including the homestead:

"The case is akin to one where the vendor cannot make a complete title to all the land sold, as agreed. In such a situation, courts do not permit the vendor to take advantage of his own wrong, and the purchaser has an election to proceed with the purchase *pro tanto*, and to have an abatement from the purchase price for the deficiency in the title. * * * [Citing cases.] A vendee may often compel specific performance where the vendor could not."

The court then quotes at length from *Presser v. Hildenbrand*, 23 Iowa 483, which quotation contains, among other things, the following:

"As he cannot get the whole, it is not denied that he may throw up the contract altogether, and seek his remedy in damages only, or he may elect to take *pro tanto* what the defendant can make title to."

In *Ormsby v. Graham*, 123 Iowa 202, this court said:

"He who, having some interest in or defective title to land, agrees to convey a good title, cannot escape his liability in an action for specific performance, provided the purchaser elects to accept such title as the vendor's deed will convey; otherwise the law would enable such a vendor to take advantage of his own fault or wrong. * * * [Citing cases.] Such a waiver of full performance has the effect to make the remedy mutual, and partial performance will be enforced, with assessment of damages or abatement from the contract price by reason of the failure to perform in full."

Applying these rules to the case at bar, and the plaintiff having elected to take specific performance for the two-thirds interest, with an abatement of price, we think the plaintiff is entitled to specific performance. It may be noted, in passing, that Katherine's attempt to rescind the contract is not based upon her inability to perform, but squarely upon the proposition that the contract was not valid or binding on her.

What has been previously said in this opinion disposes of all other questions raised by the appellants. Upon the whole record, we are satisfied with the holdings of the lower court, and the case, therefore, must be, and is,—*Affirmed*.

MORLING, C. J., and EVANS, FAVILLE, and KINDIG, JJ., concur.