**Ben FLEENOR, Appellant,**

v.

**James CHURCH, Jr., and Linda Church, Appellees.**

**No. 7085.**

Supreme Court of Alaska.

April 20, 1984.

---

Drew Peterson, Anchorage, Richard L. Whittaker, Ketchikan, for appellant.

Dennis L. McCarty, Ketchikan, for appellees.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This is an action to compel specific performance of a land-sale agreement. The superior court declined to grant the relief requested and the purchaser now brings this appeal.

The parcel of land at issue is slightly larger than five acres and is located eight miles south of Ketchikan. It was purchased by Linda and James Church, former spouses, after their divorce. They hold the property as tenants in common. On February 1, 1981, Ben Fleenor approached James Church and expressed an interest in purchasing the parcel. On February 2, 1981, James Church and Fleenor executed an earnest money agreement which provided that the property was to be sold for $25,000. Fleenor made a $5,000 down payment on

February 2; the $20,000 balance was due within ninety days.[1] Linda Church did not participate in the negotiations or sign the earnest money agreement. Nor did James Church mention Linda's interest in the property to Fleenor prior to or during the execution of the earnest money agreement. However, James testified that he gave Fleenor the original deed the Churches had received to the property during the February 1 negotiations and before the earnest money agreement was signed. Fleenor could not remember whether or not he was shown the deed at that time.

The closing never took place. After spending the last two weeks of April away from home, the Churches returned to Ketchikan on May 1. James Church then contacted the bank, where closing was to take place, on May 2, 1981, the ninetieth day, to find out whether Fleenor had approached it regarding the closing. Although May 2 fell on a Saturday, when the Totem branch was open for regular business, the officer handling the transaction for the bank did not work on Saturday. On or about May 4, the bank informed Church that the loan Fleenor had applied for, and with which he had intended to finance his purchase of the land, had been rejected.[2]

Shortly thereafter, James Church approached Fleenor, who referred to a letter he had written to Church on April 29 and inquired about whether the paperwork necessary to the transfer of ownership had been prepared. According to Fleenor, Church responded that he would produce the necessary documents and said nothing about the bank's rejection of Fleenor's loan. Church's testimony about the nature of his response to Fleenor is vague. He stated only that he departed to check his mail to find the April 29 letter which Fleenor had mentioned.

The Churches finally read Fleenor's April 29 letter on May 4 or 6.[3] This letter reads as follows:

Dear Jim,

Have tried to contact you for some time in regard to finalizing our real estate transaction.

Our Earnest money contract was for 90 days beginning Feb. 2, 1981.

Please be assured that final payment for Lots 104 & 111 is available to you on receipt by me of the necessary documents regarding transfer of ownership as per our E.M. agreement.

I understand that you have been away on an extended trip to the east and hope it was a pleasant one.

I will appreciate your contacting me as soon as possible upon your return.

Yours Truly

Ben H. Fleenor

A few days later, Fleenor approached Church to inquire about the closing. James Church then informed Fleenor for the first time that their agreement was off and stated that he would refund Fleenor's earnest money. It was at this point that Church told Fleenor of Linda's interest in the property. Two or three days later, Church presented Fleenor with the $5,000 check. Fleenor indicated that he wanted the property, not the money, and refused to accept the check.

Fleenor then filed suit against Church seeking specific performance, consequential damages for breach of contract and, in the alternative, punitive damages for Church's alleged fraudulent misrepresentation of his authority to convey the entire parcel of land. The case was tried to the

---

1. The agreement is not of record, but these terms of the agreement appear to be undisputed.

2. James Church testified at trial that he had expected Fleenor to deposit the balance of the purchase price at the bank "in escrow or whatever they normally do." Church interpreted Fleenor's failure to do so by May 2 as another indication that Fleenor had not performed his

part of the bargain. However, there is no evidence in the record that Fleenor agreed to or knew of any escrow arrangement. The significance of the parties' divergent expectations of how the transaction would be closed is discussed *infra* at pages 1355–1356.

3. This letter was the first notice Linda had of the sale.

superior court, sitting without a jury. The superior court found that James Church did not have authority from Linda to convey the property for less than $30,000; that there was insufficient evidence to support Fleenor's allegation that the sellers were to provide title insurance upon the property; that the closing was to take place at the First Bank of Ketchikan not later than May 2, 1981; and that the April 29 letter constituted an offer of tender from Fleenor to Church but that Fleenor never tendered the purchase amount. The superior court further concluded that because Fleenor had failed to tender the $20,000 balance of the purchase price he was barred from obtaining relief either through specific performance or damages, but that he was entitled to a refund of the $5,000 earnest money.

## I. TENDER

Fleenor argues that the superior court erred in holding that his failure to tender the full purchase price barred his suit to enforce the contract. He contends that he is entitled either to specific performance of the agreement to convey the entire parcel in fee simple (on the premise that James did have Linda's authority to enter into the contract) or to a conveyance of James Church's one-half undivided interest in the property and damages for fraud and misrepresentation of his authority to transfer title in fee simple.

 We have repeatedly recognized that a claim for specific performance of a contract, as a matter of equity, is addressed to the sound discretion of the trial court. *See, e.g., Hausam v. Wodrich,* 574 P.2d 805, 809 (Alaska 1978); *Jameson v. Wurtz,* 396 P.2d 68, 74 (Alaska 1964). On review this court will reverse a trial court's decision granting or denying specific performance only where it is against the clear weight of the evidence. *Hausam,* 574 P.2d at 809; *Nor-*

*ton v. Herron,* 677 P.2d 877 at 883 (Alaska, 1984).

The superior court's judgment rested on the principle that a party suing to enforce a contract must demonstrate that he would have performed his obligations but for the other party's alleged breach.[4] Here the parties agree that Fleenor's duty to tender the balance of the purchase price and Church's duty to tender a deed and other documents necessary to the transfer of ownership were concurrent duties. It is also undisputed that Fleenor did not pay the $20,000 balance owed to Church on or before the ninetieth day after the earnest money agreement was signed. Therefore, under ordinary circumstances, Fleenor would be barred from enforcing Church's duty to perform, since he had not fulfilled his own concurrent contractual obligation.

 However, an action for specific performance is an equitable proceeding, and as we stated in *Hausam v. Wodrich,* 574 P.2d 805, 810 (Alaska 1978), "courts of equity do not require literal performance of all acts required to be done under the contract before specific performance may be granted." In *Hausam* the parties entered into a contract for the purchase of an apartment building for $87,000. On the day before the closing date, the buyer was $2,000 short of the $15,000 down payment. The brokers handling the transaction, without the seller's authorization, informed the buyer that he need not raise the additional $2,000. At closing, the seller refused to complete the sale, disputing whether furniture and a dumpster were included in the bargain. On a suit by the buyer for specific performance, the trial court found that the buyer had breached the contract by not paying the full down payment of $15,000, but that the breach was not so material as to discharge the seller's obligation to convey the property. In affirming the superior court's specific enforcement of the contract, this court stated that:

---

**4.** *See Navato v. Sletten,* 560 F.2d 340, 346 (8th Cir.1977) ("It is axiomatic that before a party can recover upon a contract, he must show his own performance or his own tender thereof."); *Huszar v. Certified Realty Co.,* 266 Or. 614, 512

P.2d 982, 984 (1972) ("Ordinarily ... a party to a contract who complains that the other party has breached the terms of a contract must prove performance on his own part, or a valid tender rejected by the other party.")

Although a plaintiff seeking specific performance must demonstrate that he has the ability to perform should specific performance be granted, actual tender is not necessary where the defendant has indicated that he will not complete the transaction.

574 P.2d at 810 (footnotes omitted). *See also Kreger v. Hall,* 70 Wash.2d 1002, 425 P.2d 638, 643 (1967).

■ The instant case differs from *Hausam* in that James Church did not expressly or unequivocally indicate that he would not perform his obligations under the contract prior to the May 2 deadline.[5]

Nevertheless, we conclude that a flexible application of the requirement of tender, consistent with the authorities relied upon in *Hausam v. Wodrich,* 574 P.2d 805, 810, is appropriate in this case. A leading commentator on the law of contracts has recognized a lesser need for a strict tender requirement in an action for specific performance as compared to an action for damages. Noting that courts of equity historically had broad power to shape remedies, Professor Corbin concluded that "[i]n many fewer cases does justice require that the plaintiff should make a tender before suing for specific performance; and therefore tender is much less often held to be a condition precedent to the granting of a decree." 5A A. Corbin, *Corbin on Contracts* § 1175, at 299 (1964).

■ The Restatement (Second) of Contracts reflects a similar relaxation of the requirement of tender in actions for specific performance: "[s]pecific performance ... may be granted in spite of a breach by the party seeking relief, unless the breach is serious enough to discharge the other party's remaining duties of performance."

Restatement (Second) of Contracts § 369 at 197 (1981). Illustration (2) to Comment a on § 369 approximates the facts of this case. In that illustration the buyer of land failed to tender the purchase price by May 1, when both conveyance and payment were due. When the buyer tendered the money ten days later, the seller refused to convey. The Restatement concludes that "[s]pecific performance may properly be granted, conditioned on [the buyer] paying [the seller] any damages caused by the delay." *Id.* at 198. Thus, assuming a breach on Fleenor's part by virtue of his failure to pay the $20,000 balance before May 2, Fleenor's alleged breach was not sufficiently serious to discharge James Church's obligation under the parties' contract.

The policies justifying relaxation of the tender requirement, as reflected in the authorities discussed above and in *Hausam v. Wodrich, supra,* are particularly apposite to resolution of the instant case. Here, there is no evidence that Fleenor knew that the Churches had returned to Ketchikan on May 1. Fleenor may have assumed that, upon returning to the area and reading his April 29 letter, the Churches would advise him of their return, as he had requested in that letter. Not hearing from the Churches, Fleenor could have reasonably assumed that they were still out of town. On the other hand, Fleenor could still have gone to the bank on May 2 and tendered a check for the $20,000 balance despite the Churches' absence. James Church testified that he assumed Fleenor would do so, and that he, Church, concluded that the deal was off when he found out on May 2 that Fleenor's loan hadn't come through and that Fleenor hadn't deposited the bal-

5. It could be inferred from the Churches' absence for two weeks immediately prior to May 2 that they had either chosen not to complete the sale to Fleenor, or alternatively had chosen to be flexible about the May 2 deadline. However, it is also possible that the Churches' vacation simply happened to fall in the latter part of April, and that James Church fully intended to close the transaction with Fleenor when they returned to Ketchikan on May 1. The fact that James contacted the bank on May 2 to ascertain

whether Fleenor had attempted to carry out his part of the bargain, might support the conclusion that James was still willing to sell Fleenor the land at that late date. However, James' failure to contact Fleenor directly, to inform him of the Churches' return, belies such an inference. In short, James' conduct, both in leaving the Ketchikan area for the two weeks, and in returning unannounced, is too ambiguous to be fairly characterized as a repudiation of the contract on his part.

ance of the purchase price at the bank. However, Fleenor assumed that he and Church would meet at the bank on May 2 to exchange deed for money. Given his understanding of the manner in which the sale was to be concluded, and his ignorance of the Churches' return to Ketchikan, Fleenor's failure to present a check for the balance of the purchase price on May 2 is understandable.

 Williston notes that:

[i]t is as effective an excuse of performance of a condition that the promissor has hindered performance as that he has actually prevented it

. . . .

And if the situation is such that the cooperation of one party is an essential prerequisite to performance by the other, there is not only a condition implied in fact qualifying the promise of the latter, but also an implied promise by the former to give the necessary cooperation.

5 *Williston on Contracts* § 677A (footnotes omitted); *see also* Restatement of Contracts § 295, p. 438 (1932). The Churches' absence from Ketchikan for the two weeks immediately preceding the May 2 deadline, coupled with their failure to inform Fleenor of their return, hindered Fleenor's ability to tender the purchase price on that day. It would be unfair to allow the Churches to take advantage of Fleenor's failure to tender the purchase price where the Churches' absence contributed to, if not caused, that failure. Therefore, we hold that Fleenor's failure to tender the balance of the purchase price by

6. *See General American Life Insurance Co. v. Natchitoches Oil Mill,* 160 F.2d 140, 143–44 (5th Cir.1947) ("[T]he discretion exercised [by the trial court] must be a sound and informed discretion and not a capricious or unsound one, that is, the judge must be able to give a sound reason for refusing the remedy. Where, as here, the contract deals with land, is clear and unambiguous in its terms, and plaintiff's performance is unexceptionable, it was not the exercise, but the abuse, of discretion to refuse performance."); *see also Hochard v. Deiter,* 219 Kan. 738, 549 P.2d 970, 973 (1976).

7. James' testimony concerning his authority to sell Linda's interest in the land was equivocal.

May 2 does not bar this suit for specific performance.

In light of the foregoing, we hold that the superior court's decision denying Fleenor specific performance on the basis of the absence of a proper tender of the purchase price is against the clear weight of the evidence and should be reversed.[6]

## II. REMEDY

Fleenor is not entitled to specific performance of the contract to sell the entire parcel in fee simple. There is no evidence in the record supporting Fleenor's contention that James had Linda's authority to convey her interest in the property. The superior court concluded that he had no authority to convey it for less than $30,000. The only evidence, other than James' testimony,[7] which supports this finding that James had authority to convey the land for more than $30,000 was the letter from Mr. Geoffrey Currall, who was James' attorney, to Fleenor, which stated that "[i]n February, 1981, James and Linda agreed to sell the property for Thirty Thousand ($30,000) Dollars." However, the court had ruled that the letter was admissible "only as to Mr. Church ... [since] he said he didn't represent her." Linda testified that she never talked to Mr. Currall as her attorney and that she never agreed to sell the property for $30,000. Given the foregoing and the Churches' repeated denials that Linda had given James authority to sell her share in the land, we conclude that the superior court's finding as to James' authority was clearly erroneous.

When first asked whether he had Linda's authority to sell the land, he replied: "I wouldn't say I had the authority .... [I]f I remember right she would have sold the property for $30,000. I thought she'd probably sell it for $25[,000]." When asked again whether he was authorized by Linda to "go cut a deal with Fleenor," James answered: "Yes, I think I was for $30,000.00. I don't, you know, I didn't enter this authority. I never thought about that." In contrast, Linda flatly and repeatedly denied ever having authorized James to sell the land for $30,000.00.

 In light of the foregoing, we conclude that Fleenor is only entitled to specific performance as to James' undivided one-half interest in the property.[8] While James could not require Fleenor to accept his one-half interest in the property, Fleenor has the option to enforce the contract to the extent of James' interest. *Townsend v. Vanderwerker*, 160 U.S. 171, 16 S.Ct. 258, 40 L.Ed. 383 (1895); 5A A. Corbin, *Corbin on Contracts* § 1160 (1964). Fleenor has requested, as an alternative to conveyance of title to the entire parcel, the conveyance of James' one-half interest, plus damages for misrepresentation of James' authority to convey Linda's interest. Fleenor is entitled to an abatement in the purchase price proportional to the difference between the interest contracted for and that which was actually conveyed.[9] The principle that a contract must generally be reasonably definite and certain as to its terms to be specifically enforceable[10] has not proven an impediment to such relief. Courts have concluded that an appropriate abatement adequately implements the original intentions of the parties.

 This reasoning is consistent with Alaska precedent regarding specific performance. *Stenehjem v. Kyn Jin Cho*, 631 P.2d 482, 484–85 (Alaska 1981), recognized

that "'the primary underlying purpose of the law of contracts is the attempted "realization of reasonable expectations that have been induced by the making of a promise."' *Rego v. Decker*, 482 P.2d 834, 837 (Alaska 1971), *quoting* 1 A. Corbin, Contracts § 1, at 2 (1963) (footnote omitted)." To achieve this primary purpose, the trial courts of Alaska are encouraged to fill in the gaps in contracts in order to "give legal effect to the intention of the parties where necessary to reach a fair and just result," rather than denying specific performance because an agreement was incomplete. *Stenehjem*, 631 P.2d at 485–86. In adopting the test enunciated in the Restatement (Second) of Contracts § 33(2), we held in *Stenehjem* that "[t]he terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* at 485. *Accord, Kodiak Island Borough v. Large*, 622 P.2d 440, 447 (Alaska 1981). Applying this principle to the case at bar, it appears that the original agreement, which contains a definite price term, should furnish an adequate basis for calculating the terms of a grant of specific performance. While a 50% abatement in price would have the virtue of simplicity, we recognize that a one-half interest in

**8.** *See, e.g.: Thalis v. Wurdeman,* 121 F.2d 70, 71 (D.C.Cir.1941) (lease executed by one of four tenants in common was invalid as to others and could not be specifically enforced as to them; since they were not parties to contract or suit result would be inequitable as to them; in dicta, court observed that "[u]nder some conditions a co-tenant who promises to convey more than he owns, or who promises as agent for other cotenants when he is actually without authority to do so, may be compelled to convey what interest he has ... [unless] it would create an inequitable result or would unduly injure the rights of third parties"); *Lowe v. Williams*, 18 A.2d 424, 426 (Del.Ch.1941) (if seller makes a contract to sell land as sole owner, but merely has a partial interest therein, she will nevertheless be compelled to convey whatever interest she had unless buyer knew seller's interest was partial); *Anderson v. Weirsmith*, 209 Iowa 714, 229 N.W. 199, 205 (1930) ("The most satisfactory rule is that, although the purchaser cannot have a partial interest forced upon him, yet if he entered into the contract in ignorance of the vendor's incapacity to give him the whole, he is generally

entitled to have the contract specifically performed as far as the vendor is able, and to have an abatement ... for any deficiency .... [T]he vendee pays for what he gets according to the rate established by the agreement."); *Preece v. Wolford*, 196 Ky. 710, 246 S.W. 27, 28–29 (1922) ("[I]t is a well settled principle that an undertaking to sell a larger interest in land than the vendor owns does not relieve him from carrying out the contract as to the interest that he does own ... and [the vendee] may also have a just abatement from the purchase money for the deficiency of title or quantity or quality of the estate"); 4 Thompson, *Real Property* § 1798 (1979); 5 Powell, *Law of Real Property* § 925(2) (1982).

**9.** *See e.g.: Anderson v. Weirsmith*, 209 Iowa 714, 229 N.W. 199, 205 (1930); *Preece v. Wolford*, 196 Ky. 710, 246 S.W. 27, 29 (1922); 5A A. Corbin, *Corbin on Contracts* § 1160 (1964); Annot., 148 A.L.R. 563 (1944).

**10.** *Stenehjem v. Kyn Jin Cho*, 631 P.2d 482, 485 (Alaska 1981).

land may not be worth fully half of an undivided, 100% interest in the land. Therefore, we remand the question of an appropriate abatement in price to the superior court.[11]

In opposing such relief, James Church argues that since Fleenor, having seen the deed to the land, knew that Linda was his co-tenant, either specific performance is inappropriate [12] or Fleenor is not entitled to an abatement of the purchase price.[13] However, the superior court made no findings as to whether Fleenor knew of Linda's interest in the land. Therefore we must remand the case for findings on the question of Fleenor's notice. If the superior court finds that Fleenor did know of Linda's interest in the land, then the court should consider whether, under all the circumstances, Fleenor is entitled to specific performance of the contract, with or without an abatement in price, to the extent of James' one-half interest in the property.[14]

### III. FRAUD AND MISREPRESENTATION

Fleenor seeks damages for fraud and misrepresentation. The superior court did not address this claim. We cannot conclude, as a matter of law, that this claim is without merit. Therefore, on remand, the superior court should consider whether James Church fraudulently misrepresented his interest in the property;[15] and if so, what damages Fleenor suffered as a result.

REVERSED and REMANDED for further proceedings consistent with this opinion.

MOORE, J., not participating.

**J.E.C.,[1] Appellant,**

v.

---

11. Fleenor will have the right to accept or reject the decree of specific performance with whatever abatement, if any, the superior court finds appropriate. *See* Restatement (Second) of Contracts § 358 comment a.

12. *Lowe v. Williams,* 18 A.2d 424, 426 (Del.Ch. 1941) (When purchaser knew at time of contract that vendor only had partial interest, it would be unfair and inequitable to order even partial performance).

13. *Larson v. Kearney,* 110 N.J.Eq. 561, 160 A. 514, 515 (1932) (purchaser knowing when contract made that vendor was only a tenant in common held not entitled to conveyance of vendor's interest on paying purchase price less abatement); *Moore v. Lutjeharms,* 91 Neb. 548, 136 N.W. 343, 344 (1912) (it is generally held

that if purchaser, at time of entering into contract, was aware of the defect in the vendor's interest, he was not entitled to abatement on suit for specific performance).

14. *English v. Jones,* 154 Tex. 132, 274 S.W.2d 666 (Tex.1955); Note, *Vendor and Purchaser: Vendee's Right to Partial Specific Performance with Abatement Upon Failure of Vendor's Title,* 24 Okla.L.Rev. 495 (1971).

15. The necessary elements for such an action were enunciated in *Thomson v. Wheeler Construction Co.,* 385 P.2d 111, 113 (Alaska 1963). *See also* Restatement (Second) of Torts § 525.

