**Virginia JAMESON, Appellant,**

v.

**W. S. WURTZ, a/k/a Winn Wurtz, Zella M. Wurtz and Robert Portman, Appellees.**

**No. 431.**

Supreme Court of Alaska.

Oct. 29, 1964.

Charles J. Clasby, of Collins & Clasby, Fairbanks, for appellant.

Robert A. Parrish, by Millard F. Ingraham, Fairbanks, for appellees.

Before NESBETT, C. J., AREND, J., and DAVIS, Superior Court Judge.

AREND, Justice.

Virginia Jameson, plaintiff below, has appealed from an adverse decision of the superior court holding her equity as buyer under a long term real estate purchase contract forfeited because of her failure to comply with certain provisions of the contract.

On September 18, 1953, the plaintiff and her husband, Dick Jameson, who had been forced to dispose of his engineering business in Fairbanks because of a disabling illness, entered into a contract with W. S. and Zella Wurtz, defendants below, to purchase from the latter a Fairbanks automobile service station for the purpose of an invest-

ment.[1] The total purchase price of the property was $47,000, of which amount the Jamesons made a down payment of $15,000 and were required to pay the balance in installments of $500 on the 15th day of each month, plus interest at the rate of six per cent per annum. The contract also required them to pay the taxes, provide insurance and keep the property free of liens. It made no provision for the giving of notice between the parties in any respect. The property was under lease to Gilstrap and Martin at the time the Jamesons purchased it. The lease yielded a monthly rental income of $750. Its expiration date was January 1, 1957.

The Jamesons left Alaska shortly after their purchase of the service station. Gilstrap and Martin surrendered possession of the service station on January 1, 1957, as they were not interested in renewing the lease. So Virginia returned to Fairbanks, without her husband, to find a new tenant for the station.

Mr. Jameson died on January 31, 1957, leaving Virginia as his sole heir and devisee under his will. At the time of his death the assets of the couple consisted of about $600 in cash, Virginia's half interest in a $12,000 model or display home in Fairbanks, three or four $75 monthly payments remaining due from the sale of Mr. Jameson's former home, a $1,500 balance owing on an industrial building sold by Mr. Jameson, some corporate stock (value not stated in the record) and the service station.

Unable to find a new tenant, Mrs. Jameson decided to operate the station herself and to that end purchased the stock, supplies and equipment of the vacating lessees, Gilstrap and Martin, for $10,000. She used over half of the proceeds of her husband's life insurance to pay $3,500 of the purchase price and retired the $6,500 balance by an assignment of her $6,000 equity in the model home, plus some cash. In April of 1957 she borrowed $6,000 from the First National Bank of Fairbanks (hereinafter referred to as the bank) for the construction of a small addition to the service station building and for working capital.

It appears that Mrs. Jameson was advised by her doctor not to remain in Alaska, so she made arrangements with T. J. Williams, mentioned in note 1 above, to operate the service station for her and then left for Tacoma, Washington. However, the service station did not prosper under Williams's management and Mrs. Jameson had to return to take charge early in 1958. She found the inventory depleted and many bills unpaid. The payments on the purchase price of the service station and on the loan from the bank were not being met. Virginia herself was not employable because of ill health and she testified that she had no income or resources from which to make the payments which were due. The last payment made under the contract was on February 17, 1958, in the amount of $500 on the principal and $32.54 on interest, leaving at that time an unpaid balance of $5,500 on the purchase price; plus interest at the rate of six per cent per annum from the date of such last payment.

At about this time Mrs. Jameson contacted her supplier Union Oil Company of California in an effort to obtain a $25,000 loan from Union to be used to pay the Wurtzes and the various creditors of the service station business. Negotiations for the loan were carried on during the balance of 1958 and during 1959. In the meantime she leased the station on April 12, 1958, on a short term basis to one Herb Mayr, who had been recommended by Union.

In April of 1960 Mrs. Jameson, who was then in the State of Washington, received word from her attorney at Fairbanks that Union had decided not to make the loan. Mr. Wurtz seems to have been fully cognizant of Mrs. Jameson's efforts to obtain a loan from Union, for in January of 1960 he had inquired of Union about the status of

---

1. One T. J. Williams who was operating the service station for the lessee-occupants at the time, became a co-purchaser of the property with the Jamesons but transferred his interest to them the following year.

the loan and was told at that time that there would be no loan. Thereafter, on May 17, 1960, he withdrew the contract from escrow at the bank as provided for in the contract in the event of default by the Jamesons and then informed Mrs. Jameson's attorney that he intended to finally forfeit the interest of Virginia Jameson in the property. At this time he also made an offer to certain officials of the bank to turn the contract over to the bank if the bank would pay him off. Concerning this offer he testified:

"* * * I put the papers down right in front of them, and I says 'here's the papers,' I says 'pay me off.' I says 'my indebtedness on this here contract of sales' I says 'are yours.' I says 'you can have them. All I want is my money.' And so Eddie [referring to Edward Stroecker, president of the bank] says 'no, we can't do it' * * *."

Wurtz had made a somewhat similar offer to the bank by letter dated January 27, 1960.

On May 19, 1960, Robert Parrish as attorney for Mr. Wurtz sent a letter to Virginia, in care of her attorney, Charles Cole, advising her that her interest in the property had been forfeited and the escrow papers withdrawn from the bank on account of her default on payments. Shortly thereafter, Herb Mayr caused the keys to the service station to be delivered to Mr. Parrish, pursuant to the latter's request.

In July of 1960 one of the officers of the bank called Mrs. Jameson at Portland and informed her that "there had been a foreclosure on the property" and that the bank would lend her $7,000 to pay up the balance of principal and the interest owing on the contract. She accepted the offer and executed a promissory note secured by a mortgage on the service station for the amount of the loan.

It was not until September 1960 when Mrs. Jameson returned to Fairbanks and called at Mr. Cole's office that she saw the "forfeiture" letter addressed to her by Mr. Parrish in May. Until this time she had not even learned that Herb Mayr was no longer operating the service station and that it had

been closed down. She spent several months in Fairbanks trying to get additional funds from the First National Bank, as she had none of her own, with which to take care of all her debts. Shortly before Christmas she left Fairbanks again, without having personally tried to contact Mr. Wurtz.

Late in 1960 the executive vice president of the bank called Mr. Wurtz in Oregon and told him that the bank was ready to lend Virginia Jameson enough money to pay the balance owing on the Jameson contract, if that was satisfactory with him. Wurtz advised his caller to discuss the matter with Mr. Parrish. When approached on the subject by the bank's officer, Mr. Parrish gave the impression that payment would not be accepted and that action would be taken to "retrieve the property."

To go back a step in the course of events, when Wurtz withdrew the contract from escrow at the bank, he apprised the defendant Robert Portman, a long time acquaintance of his, of the action he had taken on account of being "pretty hard pressed for a little cash." Portman expressed a desire to help Wurtz and said that he would look into the matter of taking over the contract himself. Then, commencing in January of 1961, the following correspondence passed between Wurtz and Portman and from Wurtz to Mr. Parrish relating to the negotiation of a sale of the Wurtz interest in the subject service station to Robert Portman: January 10, 1961. Robert Portman to Winn Wurtz:

"I had quite a talk with Parrish today, and he assured me that he has the title to your property but that doesn't mean that the title is all clear as one of these smart lawyers might still be able to protect thier [sic] clients [sic] lien as after all this woman had paid in a big amount of money, Parrish said that he didn't get a quit claim deed from the woman * * *.

"Did you tell me that the Bank offered to buy your equity for just the amount that you had coming on the old con-

tract or did I just dream this * * * just quote me a figure that you will accept * * *."

January 17, 1961. W. S. Wurtz to Robert Parrish:

"This will authorize Robert Portman to recieve [sic] from you all the papers, the contract of sale * * * pertaining to Virginia Jameson and the Rite-Way Service Station * * *."

January 17, 1961. W. S. Wurtz to Robert Portman:

"Received your letter * * *.

"In regards to the First National Bank wanting to buy my equity; there was no price set on it. Bill Stroecker called me up and said that they would like to buy my equity but at that time I thot that Parrish was really working for my interests so I told Bill that they would have to deal with Parrish. The contract of sale has a balance of $5,500; plus interest to date brings a total of $6,550.00.

    *    *    *    *    *    *

"The first deal is no gamble as you will hold first mortgage and would be paid off first if anything happened.

"You would pay me $7,500.00 but I would get a percentage of 33⅓% after you had recieved [sic] $15,000.00."

January 24, 1961. Robert Portman to Winn Wurtz:

"* * * I proceed to run a title search on the Station property * * *.

"Tomorrow I am going to try and see Mr. Parrish who also received a copy of this report and it is quite possible that Mr. Parrish may know of a way to clean the title to this property with out to [sic] much cost or trouble * * *."

February 10, 1961. Robert Portman to Winn Wurtz:

"* * * I had quite a talk with him [Mr. Parrish] today * * * trying to figure out some way that we could clear up and get an insurable title but that seems to be the impossible * * * I will give you $4,000.00 for your right of redemption * * *. I would be willing to split what ever profit I would make over and above my total investment * * *."

February 14, 1961. W. S. Wurtz to Robert Portman:

"* * * I will accept your offer of $4,000.00 and a split of any money over and above all your expences [sic]. I really believe that you will make out alright [sic] as all the lienes [sic] are against Jameson but not against the property."

February 27, 1961. Robert Portman to W. S. Wurtz:

"Am enclosing herewith a Quit-Claim Deed, together with the Assignment of your equity of resumption; also my check in the sum of $4000.00, which constitutes full payment for your releasing and relinquishing your right in the property."

February 27, 1961. Robert Portman to W. S. Wurtz:

"The lawyer wrote the other letter for me * * *. I will split any profit that I might make. * * *. [N]o telling what will happen when I record the deed from you that might be the start of a series of law suits * * *."

It is to be noted that tax liens of the City of Fairbanks on the service station for the years 1957, 1958 and 1959 had been foreclosed by court action and the property conveyed to the City of Fairbanks on August 8, 1960, for nonpayment of the taxes and failure of the person entitled to do so to redeem the property within one year from the date of the foreclosure.[2] On March 2, 1961, the bank paid the taxes to the city for the years above mentioned and for 1960, in the sum of $2,091.82 out of the $7,000

2. The laws pertaining to the redemption or repurchase by the record owner of property on which tax liens have been foreclosed by a municipality are set forth in § 16–1–125k ACLA Cum.Supp. (1957) and § 16–1–125q(a) Cum.Supp. (1959), now AS 29.10.507 and AS 29.10.528(a), respectively.

loan made by the bank to Mrs. Jameson the previous year. The payment of the taxes constituted an application to repurchase the property from foreclosure. Just prior to paying the taxes the bank had made a second attempt to learn from Mr. Parrish: "[H]ow much is owed or what does it take to pay off what Mrs. Jameson owes." The answer Mr. Parrish gave was to the effect that it was too late for any payment to be made.[3]

A few days after payment of the taxes as above stated, the defendant Portman, who had completed a deal with the Wurtzes and received a deed for the service station, appeared at the city clerk's office, exhibited either the deed or an assignment of equity of redemption from the Wurtzes to himself of the property in question, and tendered a check in payment of the taxes. He was informed that the taxes had already been paid by the bank, and his tender was refused.

On June 6, 1961, Virginia Jameson commenced this action for specific performance of the contract and in her prayer for relief asked that the court order the City of Fairbanks to convey the service station to her; that the court determine the amount owing under the contract and to whom, i. e., whether to Wurtz or to Portman; and that the defendants Wurtz and Portman be required to issue a deed to her of the service station upon payment to them of the amount determined to be owing. Simultaneously with the filing of her complaint, Mrs. Jameson tendered into court from loan funds provided by the bank the principal balance of $5,500 owing on the purchase price, together with interest in the sum of $1,071.80.

Meanwhile on May 29, 1961, Mrs. Jameson completed arrangements with the bank for a $35,000 mortgage loan to pay taxes on

the service station,[4] to make the cash tender into court of the balance owing on the contract and for other contingencies.

Four days before Mrs. Jameson commenced this action, Portman purchased a permit from the city to repair the service station. He then engaged a contracting firm to do the repair work and on August 4, 1961, was billed for the total cost of the repairs in the amount of $5,134.61, which amount he paid.[5] On October 23, 1962, he leased the service station to one Larry Bush at a monthly rental of $100, with a provision that the lease would terminate in the event Portman should not prevail in this action.

The president of the bank, who was familiar with the service station property, placed a value of $40,000 upon it, except for the year of 1958 when he considered it was worth only $35,000 because the streets were torn up that year for the laying of sewer or water lines "and people couldn't get into the station." Mrs. Jameson testified that the property was worth between $40,000 and $50,000 in early 1958, the same in May of 1960 and around $50,000 in June, 1961. Mr. Wurtz valued it at $25,000 when he saw it in 1960, stating that it was dirty and out of repair at the time.

Only Robert Portman defended the action, his defense being based upon alleged abandonment of the contract by Mrs. Jameson and upon estoppel against her by laches to assert any rights in the property. For relief he prayed for a deed from the city or, in the alternative, for the balance of the purchase price and the reasonable value of his improvements from Mrs. Jameson.

At the conclusion of the trial, which was held in the summer of 1963, the court found for the defendant Portman upon the grounds that Mrs. Jameson by all her acts

3. Because both Mrs. Jameson and Mr. Portman claim the right to redeem the service station from the tax foreclosure, the city still retains title to the property, awaiting the final determination of this case, no doubt.

4. The record indicates that Mrs. Jameson and her husband's estate are credited by the City of Fairbanks for the payment of the city taxes owing for 1961 and 1962 in the amount of $1,357.36.

5. The trial court found that the total amount of money invested by Portman in the service station, including the $4,000 which he paid to Wurtz, was between $10,000 and $11,000.

had abandoned any equity she had in the property and that it would not be equitable to permit her

> to pay Robert Portman the 10 to $11,000.-00 and walk off with the property after she failed for two years to make any payments on the property, permitted the property to be sold to the City for taxes, and then failed for a third year after forfeiture, to pay balance due on the property.

In addition, the trial court found that enforcement of the forfeiture provision of the contract would not work an undue hardship on Mrs. Jameson as she had entered into the contract as an investment without any out-of-pocket cost to her; further, that such enforcement of the contract would not result in unjust enrichment to Mr. Portman.

The judgment entered by the trial court ordered that Portman reimburse the bank for all city taxes it had paid on the service station; that, upon proof of such payment, the city issue to Portman a deed to the property; and that the interest of Mrs. Jameson in the property under the terms of the contract "be and the same is hereby forfeited to Defendant Robert Portman."

Mrs. Jameson contends in her brief on appeal that there was no evidence to sustain the trial court's finding that she had abandoned the contract. She also maintains that the factual situation of this case commanded the granting to her of the relief she had prayed for in her complaint. We shall consider the question of abandonment first.

■ Abandonment by the purchaser is a valid defense to his suit for specific performance of a land contract but there must be evidence to sustain the defense.[6] Portman admits that nonpayment of the purchase price alone is not sufficient evidence of abandonment of a land contract but con-

tends that other acts of Mrs. Jameson, such as failure to pay the taxes and to keep the property insured, permitting the tax lien on the property to be foreclosed, failure to contact Mr. Wurtz and voluntary surrender of the property, coupled with the default in payments of the purchase price established the defense of abandonment, and the trial court agreed with him.

■ We are of the opinion that there was no evidence of abandonment and that the trial court's finding to the contrary is clearly erroneous. Except for the alleged act of voluntary surrender of the property, the acts and conduct of Mrs. Jameson detailed by Portman, while they are indicative of grave defaults on her part, do not constitute evidence of abandonment of the property or her interest in the contract.[7] In fact, the evidence is that soon after Mrs. Jameson found herself without funds to make the payments required by the contract, she negotiated first with her supplier and then with the bank for a loan with which to meet her obligations under the contract. Wurtz and Portman were not unaware of her endeavors in that respect.

As for the claim that Mrs. Jameson voluntarily surrendered possession of the property, it is at variance with the evidence. As already mentioned, on May 19, 1960, Mr. Parrish sent a letter to Virginia in care of her attorney at Fairbanks advising her that her interest in the property had been forfeited. Later he obtained the keys to the service station from the tenant Herb Mayr, without the knowledge or consent of Mrs. Jameson. True, she did not promptly sue to regain possession of the premises when she learned what had transpired, but she was about the business of getting a loan so that she could make the tender required to maintain a suit.

This brings us to the basic issue in this case: Did the trial court err in refusing to

6. Melco Inv. Co. v. Gapp, 259 Minn. 82, 105 N.W.2d 907, 909 (1960); Hull v. Clemens, 200 Or. 533, 267 P.2d 225, 229–233 (1954).
7. See Ford v. Hofer, 79 S.D. 257, 111 N.W.2d 214 (1961), in which the court

stated at 215–216: "The acts of the parties to a written contract for deed in order to constitute abandonment must be positive, unequivocal and inconsistent with the continuance of the contract."

grant Virginia Jameson specific performance of the contract in this case and thus effectually forfeiting all of her rights in the service station? The default clause in the contract quite clearly provided that in the event of breach by the buyers, the buyers' rights under contract would be forfeited and that the sellers could then resume possession and could retain as rental for the use of the property and as liquidated damages all sums of money paid by the buyers as part of the purchase price. The contract also provided that time should be of the essence thereof.

We recognize the legal principle approved by the Supreme Court of Oklahoma in Shull v. Welch [8] that

"Specific performance of a contract is not a matter of right, but a question of equity, and the application is addressed to the sound legal discretion of the trial court and controlled by the principles of equity in full consideration of the circumstances in each case.

"In an equitable action, the presumption is in favor of the correctness of the finding of the trial court, and it will not be set aside unless against the clear weight of the evidence." [9]

Also to be considered is the principle that equity abhors a forfeiture and will seize upon slight circumstances to relieve a party therefrom.[10] Speaking on this principle the Supreme Court of the United States has said:

"Forfeitures are not favored in the law. They are often the means of great oppression and injustice. And, where adequate compensation can be made, the law in many cases, and equity in all cases, discharges the forfeiture, upon such compensation being made * * *" [11]

Moreover in Land Dev., Inc. v. Padgett [12] this court has established by case rule in Alaska the further principle that where the contract involves land the buyer will be relieved from strict forfeiture if enforcement of the forfeiture would cause a loss to him all out of proportion to any injury that might be sustained by the seller. In that case we held that the trial court was justified in refusing to enforce literally the forfeiture of a contract for the sale of realty because of default by the purchasers and properly gave the purchasers one week to pay accrued interest and three months to pay the balance of the principal where the purchasers had been in possession of the realty for more than three years prior to default and had paid two-thirds of the total purchase price, including a substantial amount of interest. In reaching our decision we pointed out that the seller's rights

"were fully protected; for if the buyers failed to pay the balance owing by the time specified in the judgment, then their interest in the property would be entirely forfeited and the seller would regain possession. All the court did was to allow the buyers a limited opportunity to salvage, if they could, a substantial interest in the property acquired by them during the three-year period. To refuse them this period of grace would not be in accord with principles of equity and justice. The length of time allowed is a matter committed to the sound discretion of the trial court. [Footnotes omitted.]" [13]

Applying the foregoing principles of law to the facts in the instant case we find: The purchaser, Mrs. Jameson, had been in active possession of the property from September 10, 1953, the date of the contract, until Mr. Parrish, without her knowledge

8. 387 P.2d 606 (Okl.Sup.Ct.1963).

9. Id. at 609.

10. Ford v. Hofer, note 7 supra, 79 S.D. 257, 111 N.W.2d at 216.

11. Knickerbocker Life Ins. Co. of New York v. Norton, 96 U.S. 234, 242, 24 L. Ed. 689, 692 (1878).

12. 369 P.2d 888 (Alaska 1962).

13. Id. at 889–890. See also Rudolph, The Installment Land Contract as a Junior Security, 54 Mich.L.Rev. 929, 935, 951 (1956).

or consent, requested and obtained the keys to the premises from her tenant in May or June of 1960. During the first four and a half years of occupancy of the service station she punctually made the payments of both principal and interest required under the contract. During that time the sellers had received from her about 88.3% of the total purchase price and more than $4,000 in interest. Mrs. Jameson did not go into default until she was within eleven months of paying out and then only because she was without funds from which to make the payments. In the meantime she assumed all the risks that went with her entrepreneurship and equitable ownership of the property.

Mrs. Jameson's default in the payment of taxes on the property has resulted in no injury to the sellers or their assignee Robert Portman, inasmuch as she has paid up all of the delinquent taxes and the City of Fairbanks stands ready to convey the property to whomsoever the court shall designate in this proceeding. Likewise her failure to keep the property insured has resulted in no such damage to anyone for which money cannot compensate.

The trial court found that the purchase of the seller's interest in the contract "was the product of good faith negotiations between Portman and Wurtz." Here we are concerned, however, only with their good faith intentions as to Virginia Jameson. It is clear from the record the Mr. Portman did not acquire his interest in the property as an innocent purchaser but with full awareness of Mrs. Jameson's claims and the bank's' readiness to disburse its loans to her in payment of the full balance owing on the contract. He anticipated that when he paid the Wurtzes $4,000 for their interest he was buying a lawsuit. In spite of this and with knowledge that the delinquent taxes had been paid and the balance owing on the purchase price had been tendered into court with the institution of suit by Mrs. Jameson, he proceeded to spend several thousand dollars to have repairs made to the service station.

Another finding of the trial court was that the total amount of money invested by Portman in the service station, including the $4,000 paid to the Wurtzes, is approximately $10,000 to $11,000. Assuming that the property as claimed by Portman is now worth only $25,000 (and this we question seriously in view of the fact that a national banking institution has taken the property as collateral security on a loan of $35,000), to permit it to be forfeited to Portman would result in an unjust enrichment to him of at least $14,000, more than double the amount he has invested.

Under the circumstances of this case and in keeping with our holding in Land Dev., Inc. v. Padgett,[14] we find that the trial court abused its discretion in declaring a forfeiture to Robert Portman of Virginia Jameson's interest in the service station. Equity and justice required that Mrs. Jameson should have been granted a fair and reasonable period of grace within which to pay the balance of the purchase price and any other legitimate expenses which Portman may have incurred in connection with the preservation and maintenance of the property, less any rentals or other profits received by him from his use of the service station.[15] We deem it unnecessary to discuss other issues raised by the parties in their briefs.

For the reasons herein stated, the findings of fact, conclusions of law and judgment entered below are set aside and the case is remanded to the superior court with instructions to proceed in conformity with this opinion.

Reversed.

14. 369 P.2d 888 (Alaska 1962).

15. For some excellent recent treatments of the equitable principles and procedures applied in other jurisdictions in the case of defaulting purchasers under land contracts such as we have in the case under consideration, see Nelson v. Robinson, 184 Kan. 340, 336 P.2d 415 (1959); Henry Uihlein Realty Co. v. Downtown Dev. Corp., 9 Wis.2d 620, 101 N.W.2d 775 (1960).