Kurt STENEHJEM, Appellant,

v.

KYN JIN CHO and Sun Shik Cho, Appellees.

No. 4964.

Supreme Court of Alaska.

July 24, 1981.

---

Kenneth P. Eggers, Teresa A. Hogan, Groh, Eggers, Robinson, Price & Johnson, Anchorage, for appellant.

Kenneth McCaskey, Robison & McCaskey, Anchorage, for appellees.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.*

* Dimond, Senior Justice, sitting by assignment made pursuant to Article IV, section 16 of the Constitution of Alaska.

## OPINION

BURKE, Justice.

Kurt Stenehjem, the prospective purchaser of a parcel of unimproved land with frontage on the new Homer by-pass road, appeals from the superior court's refusal to specifically enforce his contract with Kyn Jin Cho and Sun Shik Cho, and from the court's failure to award him damages for the Chos' refusal to complete the transaction. Judge James A. Hanson ruled that the contract should not be enforced in light of a provision requiring the Chos to subordinate the deed of trust to be given to them by Stenehjem to any deed of trust that Stenehjem might give to an "F.D.I.C. insured lending institution."[1] We affirm the court's decision not to enforce the contract with the subordination agreement, but we remand the case for consideration of whether specific enforcement is proper without the subordination clause, or for an award of compensatory damages.

The essential facts are not disputed by the parties. The Chos purchased the property at issue in March, 1977 for approximately $40,000. They subsequently listed the property for sale with a real estate broker for $200,000. After Stenehjem made two offers on the property that were not acceptable to the Chos, the parties signed an agreement dated August 29, 1977. Subsequently, disputes arose between the parties and though attempts were made to find a satisfactory solution, the Chos ultimately refused to perform under the August 29 agreement, and Stenehjem brought this action.

### I

Based addressing the specific issues before us, it is necessary to place them in their proper perspective in the realm of the law of contracts. We have recognized that "the primary underlying purpose of the law of contracts is the attempted 'realization of reasonable expectations that have been in-

1. The purpose of a subordination provision is discussed *infra* pp. 487–488.

duced by the making of a promise.' " *Rego v. Decker*, 482 P.2d 834, 837 (Alaska 1971), *quoting* 1 A. Corbin, Contracts § 1, at 2 (1963) (footnote omitted). This realization can take place only when the contract to be enforced is "reasonably definite and certain as to its terms." *Alaska Creamery Products, Inc. v. Wells*, 373 P.2d 505, 510 (Alaska 1962).[2] As Corbin states:

> A court cannot enforce a contract unless it can determine what it is. it is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.

1 A. Corbin, *supra*, § 95, at 394 (footnote omitted).

However, these statements are tempered by language in the same section encouraging courts to give legal effect to the intentions of the parties where necessary to reach a fair and just result. *Id.* at 400. Similarly, Restatement (Second) of Contracts § 32(2) (Tent.Drafts 1–7, 1973) provides, "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." We have adopted this method of analysis in the past, and a review of the factual situations presented to the court is important to an understanding of the principles involved.

In *Rego v. Decker*, we were asked to enforce an option contract for the sale of land that did not contain a provision securing the payments to be made by the buyer.

We recognized that the failure to specify the character of a security agreement could amount to uncertainty in the contract but refused to make this a basis for an unconditional denial of specific performance. *Id.*, 482 P.2d at 838. Instead, we encouraged the trial courts to "fill gaps in contracts to ensure fairness" since we noted that:

> Except in transactions involving very large amounts of money or adhesion contracts to be imposed on many parties, contracts tend to be skeletal, because the amount of time and money needed to produce a more complete contract would be disproportionate to the value of the transaction to the parties. Courts would impose too great a burden on the business community if the standards of certainty were set too high.

*Id.* at 837 (footnote omitted). However, in the absence of reasonable certainty,

> the courts should not impose on a party any performance to which he did not and probably would not have agreed. Where the character of a gap in an agreement manifests failure to reach an agreement rather than a sketchy agreement, or where gaps cannot be filled with confidence that the reasonable expectations of the parties are being fulfilled, then specific performance should be denied for lack of reasonable certainty.

*Id.* at 837–38 (footnote omitted).

We also noted in *Rego* that "[a] greater degree of certainty is required for specific performance than for damages, because of the difficulty of framing a decree specifying the performance required, as compared with the relative facility with which a breach may be perceived for purposes of awarding damages." *Id.* at 838 (footnote omitted). In that case we determined that a proper decree could be framed, and we instructed the trial court to condition the grant of specific performance on either the payment of the purchase price in full, or the

---

2. While *Alaska Creamery* was an action for damages, we have applied the requirement of reasonable certainty in the context of specific performance actions as well. *Rego v. Decker*, 482 P.2d 834, 837 (Alaska 1971); *Lewis v.* *Lockhart*, 379 P.2d 618, 622 (Alaska 1963). *See* Comment, *Requirements of Certainty in Land Sale Contracts in Alaska*, 5 U.C.L.A.-Alaska L.Rev. 112, 113 n. 10 (1975).

furnishing of adequate security by the buyer. *Id.* at 840.[3]

Subsequently, in *Hollaus v. Arend*, 511 P.2d 1074 (Alaska 1973), we held that the trial court properly denied specific performance where the numerous uncertainties in the contract at issue manifested a failure to reach agreement. There the writing that the plaintiff sought to enforce lacked a precise description of the property conveyed, was unclear as to a down payment, failed to specify the dates on which the various steps in the transaction would be taken, and did not state the amount of monthly payments, the rate of interest on the transaction or make any provision for security. *Id.* at 1075. The encouragement of "creative adjudication" found appropriate in *Rego* was found unsuited to the circumstances in *Hollaus.*

In the present case, the Chos resisted specific performance on the ground that the subordination provision contained in the agreement made the agreement uncertain. Stenehjem responds that the provision was sufficiently certain to allow the court to invoke its equitable power "to frame a decree which assures performance on both sides . . . ." The Chos do not contend that there is uncertainty as to any other provision of the agreement, and plainly the agreement contains ample details concerning the property in question, the down payment, assumption of the prior lien, and the mortgage to be given by Stenehjem to the Chos. Therefore, resolution of the question concerning the subordination clause could allow us to find that the agreement was sufficiently definite and certain.

The Chos contend that the subordination provision "left all terms [of the subordination] to the future agreement of the parties." The provision requires the Chos to subordinate to a loan obtained from an F.D.I.C. insured lending institution. There is no indication in the record that the parties planned to enter into further negotiations concerning the loan. In effect, they dele-

gated to Stenehjem the power to arrange the loan and to agree to its terms.

We recognize that there are cases in which the courts have found contracts to be uncertain because subordination agreements failed to specify all the terms of the loan to be obtained, but we believe they can be distinguished from the case before us. One group of cases that discusses subordination agreements in terms of uncertainty relies on the finding that the parties were to agree in the future on the nature of the subordination. Thus, in *Lahaina-Maui Corp. v. Tau Tet Hew*, 362 F.2d 419, 422 (9th Cir. 1966), the court stated that the subordination clause "on its face, implies that further negotiations were contemplated." Likewise, in *Gould v. Callan*, 127 Cal. App.2d 1, 273 P.2d 93, 95 (1954), there was testimony that "the subordination agreement would be prepared at a subsequent date by defendant's attorney and he was to approve its final form . . . ." *See Yackey v. Pacifica Development Co.*, 99 Cal.App.3d 776, 160 Cal.Rptr. 430, 434 (1979).

Other cases discuss subordination agreements in terms of certainty, but they have been described as turning on the question of the fairness of the agreement, and later cases make it clear that certainty is required to make the agreement sufficiently fair to enable specific enforcement. *See* Comment, *Subordination of Purchase-Money Security*, 52 Calif.L.Rev. 157, 162–63 & n.42 (1964) [hereafter cited as *Subordination Comment*]; *Handy v. Gordon*, 65 Cal.2d 578, 55 Cal.Rptr. 769, 770–771, 422 P.2d 329, 330–31 (1967). Here we defer consideration of whether the subordination agreement contains sufficient terms to enable specific enforcement, and consider only whether the clause and the agreement sufficiently show the parties intended to be bound by their agreement and expressed such an intention with sufficient certainty.

We find that the agreement contains the terms generally material to a contract for the sale of land. In addition it includes a

---

**3.** We reached the same result in *Prokopis v. Prokopis*, 519 P.2d 814, 818–19 (Alaska 1974), where the only possible omission in the agree-

ment between two brothers to convey an interest in the subject property concerned security for the future payments.

provision by which the Chos agree to subordinate Stenehjem's mortgage to another loan, delegating to him the details of that financing. Stenehjem testified that subordination was discussed at the time the agreement was signed, and the real estate broker stated that while the subject did not come up on that occasion, he had previously discussed the meaning of the term with the Chos. In a document prepared by the broker to attempt to settle the dispute between the parties, which at that time was not related to subordination, Mr. Cho added the phrase "on a building" to the existing subordination clause. This phrase serves to limit the use of any loan that Stenehjem might obtain and shows understanding of the provision.

In light of this understanding, we believe that it is consonant with our past decisions to find that the clause expresses the parties' intentions with reasonable certainty. While we discuss below whether this provision can be enforced in accordance with equitable considerations governing an award of specific performance, that problem results not from uncertainty as to what was intended, but from a concern that the provision leaves a seller without adequate security. Here the parties have plainly stated the subordination procedure to be allowed, and we therefore hold that the agreement has binding legal effect between the parties. *See Yackey v. Pacifica Development Co.*, 160 Cal.Rptr. at 433–35; *Eldridge v. Burns*, 76 Cal.App.3d 396, 142 Cal. Rptr. 845, 865 (1978); *Lawrence v. Shutt*, 269 Cal.App.2d 749, 75 Cal.Rptr. 533, 541 (1969).

## II

## A

We therefore must consider whether the trial court erred in refusing to grant specific performance of the contract. As we have previously stated:

An action for specific performance is equitable in nature. The decision to specifically enforce a contract is within the discretion of the trial court and will be reversed on appeal only where it is against the clear weight of the evidence. *Moran v. Holman*, 501 P.2d 769 (Alaska 1972); *Jameson v. Wurtz*, 396 P.2d 68 (Alaska 1964).

*Hausam v. Wodrich*, 574 P.2d 805, 809 (Alaska 1978).

The inclusion of a subordination clause in a land sale contract raises the issue of whether the buyer's performance is sufficiently secured to allow specific performance consonant with equitable principles of fairness. We recognized in *Rego* that specific performance should be refused "if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future performance is not well secured to the satisfaction of the court." *Rego v. Decker*, 482 P.2d at 839, *quoting* Restatement of Contracts § 373 (1932).[4]

Understanding the security problems created by the inclusion of a subordination clause requires familiarity with the reasons for its use and the disadvantages incurred by a seller who agrees to subordinate. The purpose of a subordination agreement is explained by one commentator as follows:

Typically, when an individual purchases a large amount of raw acreage for the purpose of subdivision and resale, he has neither the entire purchase price nor the capital for the construction. Therefore the buyer will usually operate on long term credit. This credit often takes the form of purchase-money security in favor of the seller, and a construction loan secured by a deed of trust on the property in favor of a third party lender, normally an institutional lender.

A problem arises because the commercial lender is required by statute to hold the first deed of trust on the property.

---

4. To the same effect is Restatement (Second) of Contracts § 377 (Tent.Draft No. 14, 1979).

While the dissent argues that the conditions of the adjacent § 378 are not met here, and

thus that specific performance is available, it is apparent from an examination of the Restatement that both sections offer grounds for denial of specific performance.

However, the purchase money security is usually the senior lien. Therefore it is necessary, in order to obtain the construction loan from the institutional lender, that the buyer obtain the promise of the seller to waive his statutory priority and accept the junior lien on the property. This waiver is "subordination."

*Subordination Comment, supra,* at 157 (footnotes omitted).

Here, Stenehjem was to pay the Chos $40,000 in cash, and assume their debt of $30,500 to the prior owners of the property. The remaining $129,500 of the purchase price was to be paid in semi-annual installments of $6,000 including interest at nine percent. At that payment schedule, repayment would take slightly over forty years. The Chos were to subordinate Stenehjem's obligation to them to another loan he planned to obtain from an "F.D.I.C. insured lending institution."

It is widely recognized that a subordination agreement is unfavorable to the seller and can greatly increase the risk the seller incurs in the transaction. As one commentator notes:

When he agrees to subordinate, the seller undertakes substantial risks and becomes a de facto partner in the land development venture .... If land values decline or the project turns out to be a poor business investment, the seller may lose his investment because the amount of the construction loan may exceed the ultimate market value of the improvements. Likewise, if construction loan money is misspent by the developer, the property may not appreciate in value sufficiently to provide funds from which the seller can be paid when the property is sold. Should the developer default on the construction loan, foreclosure of the senior lien by the construction lender extinguishes all junior security interests in the property. When such a default by the developer occurs, the seller must either reinstate the construction loan and finish the project himself or redeem the senior lien by paying the entire indebtedness owed by the developer to the lender. Either course of action is usually a practical impossibility without refinancing from another lending agency because the construction loan is typically several times larger than the purchase money loan. In return for the risks he assumes the seller receives an inflated purchase price for his land.

Comment, *Purchase Money Subordination Agreements in California: An Analysis of Conditional Subordination,* 45 So.Cal.L.Rev. 1109, 1111–12 (1972) [hereafter cited as *Purchase Money Subordination*] (footnotes omitted).[5] Of course, the amount of the purchase price is meaningless if the seller never receives it, and the courts have expressed reluctance to enforce subordination agreements unless the agreement gives the seller substantial protection from the risks described above by specifying details of the loan to be obtained.

As Stenehjem points out, the subordination agreement here was entered into at a time when the parties did not know the exact nature of the financing that he would eventually receive. This is not uncommon,[6] and Stenehjem therefore urges us not to impose commercially unreasonable standards of certainty. We concur that a land sale contract containing a subordination agreement need not contain every term of the subsequent financing to be sufficiently certain to allow enforcement. However, as we explain below, sufficient terms must be present in the agreement, or be subject to implication in fact or in law, to allow the

5. *Accord,* Miller, Starr and Regalia, *Subordination Agreements in California,* 13 U.C.L.A. L.Rev. 1298, 1299 (1966) [hereafter cited as *California Subordination*]; *Subordination Comment, supra,* 52 Calif.L.Rev. at 157–58; Alexander, *Subdivision Trusts: A Proposed Standard Form,* 5 Loy.L.Rev. 487, 492 (1972); Lefcoe and Schaffer, *Construction Lending and the Equitable Lien,* 40 So.Cal.L.Rev. 439, 440–41 n.4

(1967); Annot., *Specific Performance: Requisite Definiteness,* 26 A.L.R.3d 855, 857 (1969); *Handy v. Gordon,* 65 Cal.2d 578, 55 Cal.Rptr. 769, 771, 422 P.2d 329, 331 (1967).

6. *See* G. Osborne, G. Nelson & D. Whitman, Real Estate Finance Law & 12.9, at 777 (1979); *Subordination Comment, supra,* at 160.

court to conclude that the agreement is sufficiently fair to both parties to warrant exercise of the court's equitable power.

The courts have thus required that the subordination clause "contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller's security."[7] *Handy v. Gordon*, 65 Cal.2d 578, 55 Cal.Rptr. 769, 770–771, 422 P.2d 329, 330–31 (1967) (citations omitted). In *Handy*, the court refused to enforce a contract that it found left the "defendants with nothing but plaintiff's good faith and business judgment to insure them that they will ever receive anything for conveying their land." *Id.*, 55 Cal.Rptr. at 771, 422 P.2d at 331. Here, Stenehjem contends that the subordination provision in question adequately secures the Chos' investment and we therefore turn to this question. We first examine each point asserted by Stenehjem to offer security and then consider the agreement as a whole.

**B**

■ Stenehjem argues first that the Chos were adequately secured by the payment terms of the contract. He points to the provisions for cash payments of $40,000, and for his assumption of the $30,500 obligation owed by the Chos. Stenehjem maintains that this obligation would have had to have been paid off by him before a development loan could have been obtained. He says these payments, totalling slightly over a third of the purchase price, "constitute a sufficient undertaking to assure that he would complete his performance."

As authority for this proposition, Stenehjem cites Restatement of Contracts § 373, Comment b (1932). Section 373 states that the performance of the party seeking specific enforcement must be adequately secured. In Comment b, the Restatement recognizes that

the plaintiff may already have so far partly performed and so deeply invested his funds and labor, that his own economic interest constitutes an adequate security to the defendant

. . . .

*Id.*[8] Thus, in *Adams v. Waddell*, 543 P.2d 215 (Alaska 1975), we affirmed a decree of specific performance where the lessees who held an option to purchase had spent over twice the purchase price on improvements prior to exercising the option. Here, however, while Stenehjem's self-interest indeed dictates that he attempt to fulfill all his obligations, the fact that the Chos may receive one-third of the purchase price gives them no security as to the remainder when the remaining portion is subordinated to a loan that would be a senior lien on the property. Instead, if Stenehjem's attempt to develop the property fails in one of the ways discussed above, the Chos will have received only one-third of the purchase price.

■ Stenehjem next argues that the Chos are secured by his personal liability and "creditworthiness." He points out that the Chos have recourse against him in the event he defaults on either loan, and claims this is not the case in California, where many of the decisions concerning the enforceability of subordination agreements have been rendered. We first note that California no longer applies its antideficiency legislation to prevent recovery against the buyer-developer in this situation. *Spangler v. Memel*, 7 Cal.3d 603, 102 Cal. Rptr. 807, 814, 498 P.2d 1055, 1062 (1972). Second, the California Supreme Court's decision on enforceability of subordination agreements anticipated the decision in *Spangler* by stating that "the personal liability alone of the vendee would not consti-

---

7. Stenehjem has cited cases upholding agreements which did not contain such terms. See note 12 *infra*. However, he does not disagree that the contract must afford sufficient security for his performance in order for the court to require specific performance. To the extent that the decisions of other courts do not require such security as a predicate for enforcement,

they are not in accord with our decisions or with equitable considerations and we decline to follow them.

8. Restatement (Second) of Contracts § 377, Comment a (Tent.Draft No. 14, 1979) restates this proposition without significant alteration.

tute sufficient protection to the vendor to permit specific performance." *Handy v. Gordon*, 55 Cal.Rptr. at 771, 422 P.2d at 331 (citations omitted). The commentators are in agreement that the availability of personal liability of the buyer gives little security to the seller. While Stenehjem is indeed solvent now, if the Chos were to seek recovery against him it would be at a time when Stenehjem had defaulted on his obligation to an institutional lender and presumably would be insolvent. *See Subordination Comment, supra*, at 158 n.7; Comment, *The Supreme Court of California 1971–1972: Application of Antideficiency Statute to Construction-Subordination Arrangement*, 61 Calif.L.Rev. 273, 545 (1973); 13 Santa Clara Law., 170, 173 (1972).

We recognize that a seller who accepts a mortgage from the buyer in an ordinary land sale transaction takes the risk that the buyer will become insolvent at a later date. There the seller is secured by the value of the land, to which the seller has recourse in the event of a default. Where the seller agrees to subordinate, however, it is the senior lienholder who has recourse to the land, and the seller can look only to the buyer's personal liability.

Here, Stenehjem presented no evidence indicating that he has large financial resources sufficient to provide some security in the event his planned development is unsuccessful. On the contrary, he is 27 years old, had been a general contractor for approximately four years at the time of trial, and has lived in Homer only since 1977. While Stenehjem contends that the Chos had an opportunity to investigate his financial responsibility, we do not believe this opportunity justifies a decision to require specific performance in light of the equitable considerations that govern such a decision.

Stenehjem argues next that the parties' agreement impliedly limited the use of any loan Stenehjem obtained to development of the property, and that this limitation adequately secures the Chos' position. The basis for this contention is that loan money used in development adds to the value of the property, and that in the event of a default the property would be worth enough to cover both the outstanding development loan and the money owed to the seller. *Purchase Money Subordination, supra*, at 1112–13. Here, we agree that the factual context of the agreement between the Chos and Stenehjem shows that a loan for development purposes was contemplated. And even if it were not possible to make this factual implication, we believe that such a limitation could be implied in law as well. As one court stated:

> While it may not be impossible that a vendor has agreed to subordinate his purchase money lien to a lien secured by the purchaser to be used for purposes entirely apart from the mutual enterprise, such an arrangement would be so unusual and so unlikely that we would require it to be spelled out with particularity. Typically the loan proceeds are to be used for purposes which will promote the mutual enterprise and which will either enhance the vendor's equity in case he must foreclose his lien, or will provide funds from which he will be paid. A subordination agreement should be construed, unless it expressly provides otherwise, as permitting the loan proceeds to be used only for such purposes.

*Miller v. Citizens Savings & Loan Ass'n*, 248 Cal.App.2d 655, 56 Cal.Rptr. 844, 851 (1967).

Stenehjem can point to no case, however, in which it was held that the limitation of a senior lien to development purposes was determinative of the enforceability of the agreement. The mere fact that a loan is spent on construction does not mean that the property increases in value in an amount equal to the loan. *Subordination Comment, supra*, at 157 & n.5.

> [T]here is not always a direct relation between the construction expenses and a rising land value. Excavations and foundations are of negligible value when the project fails. The large increase in value is realized only when the improvements obtain a significant market value.

> The assumption that the cumulative value of the construction and purchase

money liens do not exceed the value of the property is therefore inaccurate.

*Id.* at 157 n.5. Thus, we think this limitation is important only if the agreement as a whole provides adequate security.

■ Stenehjem also contends that the fact that the agreement requires a development loan be obtained from an F.D.I.C. lending institution provides additional security to the Chos. While Stenehjem failed to offer evidence to the trial court as to the effect of this provision, he argues that the court was required by former Rule 43(a)(1), Alaska R.Civ.P.,[9] to take judicial notice of federal and state statutes limiting the amount that banks may lend upon the security of unimproved real estate. We believe the statutes cited by Stenehjem fail to add certainty or security to his agreement with the Chos.

The statutes purport to set limits on the amount of a loan based on a set percentage of the property's appraised value.[10] It would seem that the appraised value would have to include the value of the improvements to be constructed with the loan proceeds. The cost of improvements commonly exceeds the cost of the underlying land, and thus a construction loan would not be limited to a percentage of the land value. This conclusion is in accord with the testimony at trial, as both Stenehjem and the real estate broker handling the transaction acceded to the suggestion that a loan of $1,000,000 could theoretically have been obtained by Stenehjem in a senior position to the obligation owed the Chos.

No evidence was submitted to the trial court concerning these statutes, and thus we have no way of knowing whether they are enforced or whether enforcement provides any security to a subordinating seller. No authority suggests that the statutes make a subordination agreement enforceable, and we decline to so hold here.

Stenehjem also argues that the limitation to F.D.I.C. institutions "guarantee[s] the general soundness of the institution's banking practices," and both Stenehjem and the real estate broker testified that the limitation protected the Chos by preventing subordination to other than a reputable lender. The institutional lender commonly controls disbursements of loan proceeds, making them progressively as work is performed, after on-site inspections. *Subordination Comment, supra,* at 157 n.5. These practices are intended to assure the lender and the seller that the value of the property increases as the loan proceeds are spent, so that in the event of a default the property can be sold for an amount equal to both outstanding loans. *California Subordination, supra* note 5, at 1299; *Purchase Money Subordination, supra,* at 1112–13. However, it has been recognized that while correlating disbursement of the loan with the progress of construction work offers significant protection to the lender, who has recourse to the land as well as the improvements in the event of a default, the subordinating seller is not afforded much protection because the default may occur at a time when the amount of construction does not correlate to an increase in property value. *Purchase Money Subordination, supra,* at 1112 n.12; *Subordination Comment, supra,* at 157 n.5.

Requiring that the loan be obtained from an institutional lender does afford protection to the seller insofar as it provides some assurance that the less significant details of

---

**9.** Former Rule 43(a)(1) provides in pertinent part: "Without request by a party, the court shall take judicial notice of the . . . public statutes in force in every state, territory and jurisdiction of the United States . . . ."

Since the trial in this case we promulgated the Alaska Rules of Evidence, and Rule 202(b) carries forward the provisions of former Rule 43(a)(1).

**10.** AS 06.05.206(c) allows banks to make construction loans on real estate of up to 80 per-

cent of the appraised value where specified improvements are made. Under 12 U.S.C. § 371(a)(1), national banking associations are limited to loans of 75 percent on the appraised value of real estate that is to be improved. However, 12 U.S.C. § 371(f) allows banks to make loans in excess of that amount as long as the total amount of such loans does not exceed 10 percent of the total amount that a bank may invest in real estate loans.

the financing will be handled properly, and it has been suggested that this limitation obviates the need to specify these details in the original agreement. *California Subordination, supra* note 5, at 1305. However, the limitation to an institutional lender is only pertinent to incidental parts of the transaction, where specification would make the agreement unwieldy, and does not substitute for provision in the agreement of the major terms of the loan. *Id.*[11]

## C

We have considered each of Stenehjem's contentions concerning the subordination clause individually, but we agree that the ultimate decision as to the agreement's enforceability requires us to consider it as a whole, and decide whether it is sufficiently certain and just to warrant enforcement. We reiterate that this decision is vested in the trial court's discretion in the first instance and that a court may fill gaps in a contract where it is necessary to make the agreement amenable to enforcement, but such gap-filling must be in accord with the parties' intentions.

Here, we have construed the agreement to require the Chos to subordinate two-thirds of the purchase price to a loan to be obtained from an F.D.I.C. lending insti-

tution to be used for the construction of improvements on the land. As so construed, the subordination provision fails to (1) limit the amount of the loan to which the Chos would subordinate, (2) limit the interest rate of that loan, (3) set maximum and minimum payment periods for the loan, or (4) describe the method of repayment of the loan. The courts and commentators have stated that inclusion of provisions concerning these items serves to give a seller sufficient security that the buyer will perform so as to enable a court to enforce the agreement. *Subordination Comment, supra,* at 163–64; *California Subordination, supra* note 5, at 1302–05; *Purchase Money Subordination, supra,* at 1112–13; G. Osborne, *supra* note 6, at 780; *Handy v. Gordon,* 65 Cal.2d 578, 55 Cal.Rptr. 769, 771, 422 P.2d 329, 331 (1967); *White Point Co. v. Herrington,* 268 Cal.App.2d 458, 73 Cal. Rptr. 885, 889 (1968); *Loeb v. Wilson,* 253 Cal.App.2d 670, 61 Cal.Rptr. 377, 380 (1967).[12]

In particular, a limit on the amount of the senior lien allows the seller a measure of control over the scope of the construction project to be undertaken. If the construction loan is reasonably proportional to the value of the underlying land, or if it does not exceed the value that the improvements add to the land, then in the event of a

**11.** The authors of *California Subordination, supra* note 5, at 1305, state:

There are innumerable other provisions of the new loan which might be specified. For example, should the amount of possible prepayment charges and late "penalties" be determined? Should the detailed provisions of the note and deed of trust to be delivered to the third party lender be specified? Should the agreement describe the type or nature of the improvements to be constructed on the property? These limitations could probably be inserted in the agreement, such specificity may be unwieldy. The seller can obtain sufficient protection by simply limiting the source of the new loan funds to a federal or state-chartered bank or savings and loan association, or an insurance company, and by providing that the provisions of the new loan, except for the limitations as to amount, term, interest rate, and amortization period and terms, shall be as required by the lender. Such lenders have established loan and security instruments with standardized provi-

sions and, to some degree, they are subject to government regulation.

(Footnotes omitted.)

**12.** As we noted in note 7 *supra,* there are cases enforcing agreements absent terms that give protection to the seller. *See, e. g., White & Bollard, Inc. v. Goodenow,* 58 Wash.2d 180, 361 P.2d 571, 574 (1961) (enforcement allowed where seller "was content to trust the purchaser to see that the terms were reasonable." *Rivers v. Rice,* 233 Ga. 819, 213 S.E.2d 678, 680 (1975) (refusing injunction against foreclosure sale by senior lienholder, citing *Ideal Realty Co. v. Reese,* 122 Ga.App. 707, 178 S.E.2d 564, 565–66 (1970), an action for damages where the seller had the option of agreeing to subordinate). There are also California cases upholding subordination clauses containing only a few terms of the senior loan, but all involve situations different from that presented here. *See* Annot., *supra* note 5, 26 A.L.R.3d at 868–71; *California Subordination, supra* note 5, at 1305 n.27.

default the seller may have the opportunity to cure the default and avoid the loss of his security. A limit on the interest rate of the construction loan also limits the risk which the seller undertakes in subordination since it may prevent commencement of a construction project with an unsuitably high risk of failure. The interest rate also affects the size of the payments on the loan, which may affect the seller's ability to take over the project.

A restriction on the maximum duration of the senior lien allows the seller to avoid being placed in a subordinated position for an overly long time. A specified minimum term for the construction loan insures that the loan does not fall due prior to the return on the buyer's investment, and thus makes it more likely that the buyer will be able to meet each payment as it comes due, and that the seller will not have to make overly burdensome payments should he or she have to take over the construction loan. *Subordination Comment, supra,* at 163–64; *California Subordination, supra* note 5, at 1303.

A description of the method of repayment also serves to give the seller some control over the project and allow the protection of his or her interests in the event of a default, particularly if payments are limited to a stated amount, or if they equally amortize the loan. *Id.*

The agreement here has been construed to limit the use of loan proceeds to development of the land, and we have noted this

protects the seller by providing some assurance that the loan serves to increase the value of the property.[13]

The agreement before us limits the use and the source of Stenehjem's financing, but we believe this is insufficient to give the Chos any significant assurance that a development plan undertaken by Stenehjem will not create unwarranted risks for them. Such risks include the possibility that the project will be of such magnitude that they will be unable to rescue it in the event of a default, or that the financing will give inadequate consideration to their interests. As we have noted, while limitation of the use of loan proceeds to development purposes offers some security to the seller, the likelihood that the amount of construction will not correlate with an increase in the value of the property prevents this provision from sufficiently securing the seller's investment.

Where the seller agrees to subordinate to the buyer's obligation, he or she remains vitally interested in the progress and ultimate success of the development project. A court's determination of whether an agreement is sufficiently certain and fair to allow specific enforcement must therefore take into account the amount of recognition the agreement accords to this interest. Here, we do not believe that the agreement affords adequate security for the Chos' investment and it does not include terms widely recognized as providing such protection.[14]

---

**13.** While not reflected in the cases, it has been suggested that the subordination provision also specify whether loan proceeds may be used to pay the cost of obtaining the loan, and that a limit on the loan fee to be paid also be stated. *Subordination Comment, supra* at 164; *California Subordination, supra* note 5, at 1304; *Purchase Money Subordination, supra,* at 1118 n.35.

**14.** Stenehjem argues that the amount of profit the Chos may realize on their sale to him should be considered in deciding whether the agreement should be enforced. However, as we have pointed out, such profits mean little if the Chos never receive them because of the agreement's failure to give them adequate security. Stenehjem cites no case which has

used this as a basis to decide the question, and we decline to give the purported profit any significant weight. We note instead, that even with the inclusion of terms to minimize a seller's risk in agreeing to subordination, this procedure still has significant risks for a seller. 13 Santa Clara Law., *supra,* at 173. Thus where steps have been taken to give the seller protection, the fact that the seller receives a premium makes the agreement fair to both sides and allows enforcement even though some risk remains.

For these reasons, we also reject the intimation of the dissent that the possibility of a large profit obviates the need for a court to determine if the performance of both parties to an agreement is adequately secured.

Stenehjem asks us to judicially fill the gaps in the subordination clause so as to enable enforcement, but he does not suggest any way that this could be accomplished and have any basis in the agreement of the parties. We likewise see no way to accomplish this task. Though in *Rego v. Decker* the trial court could conceivably have required that a mortgage be given to the sellers in order to give them sufficient security, here that method would not plug the gap. Instead, detailed specification of terms would be necessary that would put the court in the inappropriate position of drafting a subordination clause for the parties. We have never undertaken to do this, and therefore we uphold the trial court's decision not to decree specific enforcement with the subordination clause. In so doing, we do not hold that the provisions discussed above must be included to make a subordination clause enforceable, but we note that such provisions are a valuable guide to an agreement's fairness, and that in light of this agreement's failure to otherwise provide the sellers with security, enforcement must be declined.

### III

■ Stenehjem contends that even if enforcement is denied because the agreement fails to provide the Chos with adequate security, the court can use its equitable powers to enforce the contract without the subordination provision. In essence, his argument is that the trial court abused its discretion in not conditioning an award of specific performance on his willingness to forego the benefits of the subordination clause.

Our past decisions demonstrate a willingness to use a court's equitable powers to reach a fair and just result. In *Rego*, we gave the trial court substantial leeway in formulating a decree that gave the buyer the benefit of his bargain and provided adequate security to the sellers. While the contract of the parties there did not give the buyer the option to pay the purchase price in full, nor require him to furnish the sellers with some security that he would

perform, we instructed the trial court to make its decree conditional upon the choice by the buyer of one or the other alternative. *Rego*, 482 P.2d at 839–41. Similarly, in a number of decisions this court has instructed trial courts to disregard forfeiture provisions contained in a contract where equity so requires, and to grant specific performance instead. *E. g., Ficke v. Alaska Airlines, Inc.*, 524 P.2d 271, 279–80 (Alaska 1974); *Moran v. Holman*, 501 P.2d 769, 771 (Alaska 1972).

The Chos oppose the granting of specific performance even without the subordination provision. They note first that Stenehjem did not waive the benefit of the subordination clause at trial. We decline to find this dispositive because we do not believe that the question is properly subject to analysis in terms of waiver. In *Rego*, we did not require that the buyer have made a request to the trial court to make full payment of the purchase price, or to give some security of performance, as a predicate to our decision to require such an act as a condition to specific performance. Likewise here, we do not think Stenehjem should be barred from receiving a conditional decree because he did not anticipate the court's decision, particularly where the trial court believed that the defects in the subordination clause rendered the entire agreement without effect. In the future, however, it would be sound practice for a party in Stenehjem's position to offer this alternative.

The Chos also argue that the subordination provision was of benefit to both parties and therefore a decision to enforce the contract without it would be improper. Given their strenuous argument that the provision deprives them of any security that Stenehjem will perform, and our own analysis of the effect of such provisions, we have considerable difficulty accepting this contention. They do point to the decision in *Lahaina-Maui Corp. v. Tau Tet Hew*, 362 F.2d 419 (9th Cir. 1966), as authority for their position, but there the parties had entered into a long-term lease, not a sale, so that the subordinating lessor could expect to eventually receive the benefit of any improvements. The Chos also claim that a

proper subordination provision offered them security, "a means of being more readily able to market their property, and reach a greater number of prospective buyers." Plainly any subordination provision gives them less security than that offered by a first deed of trust. The Chos' concerns with marketing the property and reaching prospective buyers are irrelevant if they have sold the land to Stenehjem, and receive the price they sought.

We thus believe that Stenehjem has suggested a sensible way to give the parties the benefit of their bargain and at the same time give adequate security for his performance. However, we do not find it appropriate for this court to mandate that such a decree issue, as the trial court should have an opportunity to consider the issue and, if it thinks appropriate, to take testimony concerning the effect of this remedy.[15]

### IV

Stenehjem's final attack on the trial court's judgment is on the court's failure to award damages for the Chos' refusal to perform the contract. Obviously there is no need to consider this issue if specific performance is granted, but in view of our disposition of that question, we think it appropriate to consider the question of damages to aid the trial court in the event it determines specific performance is improper.

We have already determined that the agreement between the parties here constitutes a binding contract, but that it does not warrant specific enforcement because of the equitable considerations inherent in that remedy. However, as we recognized in *Rego*, damages may be awarded in situations where specific performance is inappropriate. *Rego v. Decker*, 482 P.2d at 838. *Gulbenkian v. Gulbenkian*, 147 F.2d 173, 175–76 (2d Cir. 1945); 5A A. Corbin, *supra*, § 1161, at 200–01; 11 Williston, Law of Contracts § 1444, at 985 (Jaeger ed. 1968); Restatement of Contracts § 370, Comment b (1932). Also, a Florida court has held that damages are available where specific performance was denied because a subordination clause and other provisions lacked sufficiently certain terms. *Lasseter v. Dauer*, 211 So.2d 584, 585 (Fla. App.1968). *Accord, Benson v. Chalfonte Development Corp.*, 348 So.2d 557, 560 (Fla. App.1976); therefore, if the court does deny specific performance it should make an award of damages for the breach of the agreement by the Chos, relying on the testimony previously taken on this subject, unless the court finds it necessary to augment the record.

**REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

COMPTON, J., not participating.

MATTHEWS, Justice, joined by RABINOWITZ, Chief Justice, dissenting.

I agree with the majority's interpretation of the parties' contract. As so interpreted,

---

**15.** We have previously noted that the buyer desiring inclusion of a subordination provision in a land sale contract must usually pay a premium purchase price for the land. Therefore, there may be instances in which the court, in making a decision to enforce a contract without the subordination provision, should consider whether the purchase price is still fair if the buyer does not receive the benefit of utilizing the subordination procedure. As Corbin has recognized:

> In some cases specific performance may be an available remedy as to part of a promised performance and not be available as to the remainder.... In these cases the court may decree specific performance of the first part, with compensatory damages as to the remainder that is unperformed.

5A A. Corbin, *supra*, § 1160, at 185 (footnote omitted). *Accord*, D. Dobbs, Law of Remedies § 12.10, at 849–50 (1973).

Of course, the court is free to determine that the price is fair even without the subordination provision, particularly where, as here, the buyer argues that he be allowed to purchase the land without the clause, or where it is not apparent that subordination influenced the price term of the contract. It is also possible that lack of evidence concerning a fair price absent the subordination provision would lead the court to decline to adjust the price, since remedies for breach of contract should have a basis in the agreement of the parties.

I believe the contract should be specifically enforced.

In my view the question which should be asked in each case where specific enforcement is sought is whether the transaction is a fair one. Of course, adequate security is relevant to the question of fairness, but it is not determinative in every case, because a transaction can be fair, and unsecured, or unfair, and well secured.

Restatement (Second) of Contracts § 378 (Tent.Draft No. 14, 1979) describes the types of unfairness which will preclude the application of equitable remedies. It takes the position that

(1) Specific performance or an injunction will be refused if such relief would be unfair because

(a) the contract was induced by mistake or by unfair practices,

(b) the relief would cause unreasonable hardship or loss to the party in breach or to third persons, or

(c) the exchange is so grossly inadequate or the terms of the contract are otherwise unfair.

The record discloses no evidence of mistake or unfair practices in the inducement to contract. Nor would specific enforcement of the agreement cause unreasonable hardship or loss to the Chos. Consequently, here the fairness question depends solely on whether the agreed upon consideration is grossly inadequate or the terms of the contract are otherwise unfair. On this record, I think that neither conclusion can be justified.[1]

A subordination agreement is a contract term over which parties frequently bargain. A buyer is often willing to pay a higher price for a contract which includes a subordination clause than for one which does not because the clause will reduce, or eliminate, the need for the buyer to come up with additional capital in order to obtain bank financing for the proposed project.

The record indicates here that the sale was quite favorable to the Chos. They paid approximately $40,000.00 for the property in March of 1977. Less than two months later they listed it for $200,000.00 and sold it for that price to Stenehjem in August of the same year. The terms of the contract provide for $40,000.00 in cash payments to the Chos, assumption of the Chos' debt of $30,500.00 to the prior owners, payment of the remaining balance, $129,500.00 in semi-annual installments of $6,000.00 including interest at nine per cent. On this record it appears that the amount which the Chos stand to gain under the contract is not disproportionate to the risks which they must bear.

---

**1.** It is unusual to find unfairness in the exchange itself without evidence of artifice, sharp practice or the like in its inducement. *See* Restatement (Second) of Contracts § 378, Comment b. *See also* 5A A. Corbin, Corbin on Contracts § 1165 at 224–26 (Rev. ed. 1964).